[Cite as *State v. Watson*, 2024-Ohio-1711.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No.  L-23-1082

    Appellee                                          Trial Court No.  CR0202201712

v.

James Watson                                      **DECISION AND JUDGMENT**

    Appellant                                          Decided:  May 3, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee.

Tyler Naud Jechura, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, James Watson, appeals the March 24, 2023 judgment of the

Lucas County Court of Common Pleas sentencing him to 36 months in prison.  For the

following reasons, we affirm.

## I.  Background and Facts

{¶ 2} Watson was charged with one count of domestic violence in violation of

R.C. 2919.25(A) and (D)(1) and (4), a third-degree felony.

**{¶ 3}** Watson's case was tried to a jury beginning on March 7, 2023. At trial, the state presented the testimony of A.J., Watson's wife and the victim in this case; Kayla Bruner, a nurse at the University of Toledo Medical Center ("UTMC"); Melissa Waldman, a nurse practitioner at UTMC; detective Lisa Fauver and officer Eric Macek of the Toledo Police Department ("TPD"); and two officers who authenticated Watson's prior domestic violence convictions and jail calls. Watson called Gwendolyn Watson, his mother, as his only witness. The following facts were elicited at trial.

### A. A.J.'s testimony

**{¶ 4}** A.J. is Watson's wife. They lived together at the time of the events underlying this case.

**{¶ 5}** The morning of March 15, 2022, A.J. came home from work around 3:30 or 4:00 a.m. Soon after she got home, around 4:00 a.m., Watson woke up and started arguing with her because Watson "had a bad dream that [A.J.] was cheating on him . . . ." Although the fight started as verbal, it soon turned physical; Watson first pushed A.J., then hit her in the face with an open hand, and then punched her in the face. He punched her in the face "too many times to even count[,]" and she described the force of his punches as a ten out of ten. Watson also kicked and strangled her by putting both of his hands around her neck. A.J. pleaded for him to let go, which he did for a couple of seconds before grabbing her by the neck with one hand and punching her face with the other. While he was strangling her, Watson told A.J. that "everything was [her] fault . . ."

2.

and he hoped that a chronic disease she had "would kill [her]." A.J. lost consciousness during the assault.

{¶ 6} A.J. said that it seemed like the assault lasted "forever." She tried to get to the balcony of the second-floor apartment so that she could jump off of it to get away from Watson because she "was afraid that he would like kill [her] or really hurt [her,]" but was unable to do so. She could not call 911 because Watson took her cellphone.

{¶ 7} At some point, the beating stopped, and A.J. heard Watson walking around the apartment "asking about where a knife was at and saying that he was going to kill his self and take [A.J.] with him." Watson eventually found a knife, which he held on to as he paced. A.J. "[t]ried to talk to him to reason with him to calm him down" and asked him to take her to the hospital because she was having chest pains.

{¶ 8} Watson eventually agreed to take her to the hospital. He drove her to Toledo Hospital, and yelled at her "all the way there." When they pulled up to the hospital, Watson told A.J. to wipe her face because she was bleeding from her mouth. As A.J. tried to get out of the car, Watson changed his mind and drove away from the hospital. As Watson was "flying" down the "short little street" beside the hospital—going around 55 or 60 m.p.h.—A.J. got scared and jumped from the moving car. She claimed that she did so because "[i]t was fight or flight" and she was trying to get away from Watson. She denied jumping from the car because she was trying to kill herself. After A.J. jumped, Watson parked the car, picked her up from the grass, and put her back in the car. A.J.

3.

said that she was hurt when she jumped from the car, which she later described as some "road rash" on her left foot.

{¶ 9} Back in the car, Watson started yelling at A.J. again. He grabbed and held her shirt so tightly that she could barely breathe. She tried to tell him to let go and assure him that she would not jump out of the car again in an attempt "to calm him down." Watson apparently parked somewhere and climbed on top of A.J. as she sat in the passenger seat and resumed punching her in the face. While punching her, Watson told A.J. that he should "kill [her] now" and put her body behind a bush where no one would find her. She estimated that this happened around 5:00 a.m.

{¶ 10} When Watson calmed down, he drove back toward their apartment. As they were driving, A.J. told him that she "really needed" to go to the hospital because of her chest pains. Watson drove her to UTMC. When the doctors and nurses came to examine A.J., Watson "spoke for [her] the whole time." She said he did so because she was "still in shock[,] . . . still in pain[,] . . . still trying to comprehend everything that had just happened." Watson told UTMC staff that A.J. was having chest pains and dizziness and fell when she got out of the car. Due to the severity of A.J.'s injuries, UTMC staff "called a trauma." When staff tried to undress A.J., Watson told them that he would do it. When they were in the room alone after Watson undressed A.J., he told her that he had to leave because "he felt that the police were going to get involved because of [A.J.'s] injuries."

4.

{¶ 11} After Watson left, nurses told A.J. that she was safe and asked her what really happened to her. She told them of all of the abuse Watson had inflicted on her that morning. She later gave the same statement to police officers and Fauver, and told Fauver that she wanted to press charges against Watson.

{¶ 12} Testing found that A.J. had an orbital facture and bleeding in both ears, and that she was about six weeks pregnant. Pictures of A.J.'s injuries that the state presented to the jury showed scrapes on the top of A.J.'s left foot, a cut on the inside of her upper lip, swollen eyes, some discoloration near each eye, and a dark spot inside her left ear that A.J. said was blood.

{¶ 13} A.J. testified that she is scared of Watson.

{¶ 14} On cross-examination, A.J. said that she continued to live with Watson following the assault. After March 15, they moved out of their apartment, lived with Watson's parents for about a month, and, in May 2022, moved into a new apartment that Watson "paid for [them] to move into . . . ." A.J. was pregnant at the time, and said that she and Watson "tried to work everything out." She moved with Watson, despite claiming to be afraid of him, because she was "trying to keep [her] family together and trying to build a better foundation for [their] child." She also explained that she stayed with Watson because she was pregnant, could not work, and "didn't have nowhere else to go."

{¶ 15} In December 2022, A.J. wrote a letter addressed to the trial judge, prosecutor, and defense attorney recanting her allegations against Watson. In the letter,

5.

she said that another man had beaten her on March 15, and, at the hospital, she blamed her injuries on Watson because she was in shock. She also said that Watson had not pushed her out of the car that day. She claimed that Watson told her what to write, i.e., that he had not hurt her, another man was to blame, and she was in shock when she blamed Watson. To explain why she wrote the letter, A.J. said that she was pregnant again (after having miscarried the pregnancy she learned about on March 15) and "was trying to keep [her] family together . . . ." She also said,

> We were still going through a lot of abuse. When I found out about our child, I tolerated it, and I tolerated it to the point that I couldn't tolerate it any more. So when I wrote that letter, I was still tolerating all the abuse. When I finally walked away from him, and I let it be known about the letter that it was all false because I had grew from him. I was able to think clearly that what I was going through was not accurate. That it was not right.

{¶ 16} A.J. testified that she was not truthful in the December 2022 letter. She told the prosecutor that the letter's content was untrue four days after writing it. According to her, the "correct story" was the statements she gave to TPD officers and Fauver on March 15, and the jurors should believe her March 2022 statements, not the December 2022 letter.

{¶ 17} On redirect, A.J. clarified some of her cross-examination testimony. First, A.J. said that she did not did not "go back to" Watson until about three weeks after

6.

March 15.  She and Watson argued while they were living with his parents, but "never argued inside the household[,]" and there was physical violence between them during that time.  Things were "fine for a little bit" after they moved into their new apartment, but they eventually got into another argument, and A.J. went to stay with her mother.  While she was living with her mother, Watson came to the house several time.  The last time, they got into an argument and Watson "kicked [her] mother's gate, her door to her house . . . ."  About three weeks later, A.J. went back to the apartment with Watson.  She returned because, "it was my home.  You know, you don't want to stay with your parent all the time.  So my mom need her space and I understood that.  So I went back and dealt with what was going on in the household."

{¶ 18} When she wrote the December letter, A.J. was at the library with Gwendolyn, Watson's mother.  Watson asked her to write the letter "on numerous occasions."  Her reference to Watson pushing her out of the car and blaming another man for the beating were untrue.  She wrote the letter to try to keep her family together and so Watson "would be out for the birth of his child."  A.J. did not intend for the court to get the letter, and did not send it to anyone.  Gwendolyn also had a copy of A.J.'s letter.  The phone number handwritten under A.J.'s signature was an old number that she had not used since August 2022, and she did not recognize the handwriting.

{¶ 19} To explain why she stayed with Watson, A.J. said,

I stayed with him because I loved him.  And I was always looking over all

the bad stuff.  So basically love is blind.  I saw something that wasn't there.

7.

He didn't care for me like I cared for him or I would go above and beyond just to make sure everything was taken care of until it was like basically too late or we get into the real bad argument and he'd be like, well, I'll try to fix it.

**B. Medical testimony**

{¶ 20} Bruner and Waldman each testified about A.J.'s injuries and Watson's actions at the hospital.

{¶ 21} Bruner was the nurse who documented the trauma response to A.J.'s injuries. She recalled that the hospital was placed on a lockdown on March 15, 2022, because A.J. reported being abused, threatened, and fearful for her safety. She identified Watson as the cause of the lockdown. Although Watson had left the hospital, Bruner said that the lockdown was initiated for A.J.'s and the staff's safety because he was "threatening towards" the staff before they took A.J. for a CT scan.

{¶ 22} A.J. initially presented with chest pains, and had an EKG related to that. However, staff later learned that A.J. "exited a moving vehicle going approximately 40 mile an hour . . . ." Bruner noted in her trauma documentation that A.J. had abrasions on her feet that "indicate[d] that indeed she very likely fell out of a moving vehicle."

{¶ 23} Initially, A.J. was "really quiet" and Watson was speaking for her. After medical staff separated them, A.J. was "tearful" and told staff that she "exited the moving vehicle because she was afraid for her safety, and she had been getting abused and threatened." She also believed that Watson might leave the hospital. Due to A.J.'s abuse

8.

allegations, Bruner called a social worker for A.J. and called the emergency room to ask them to call police and put the hospital on lockdown. As Bruner described the lockdown, people could leave the emergency room, but could not come back in after leaving.

{¶ 24} Bruner identified some "red flags" that caused staff to separate A.J. and Watson. Specifically, (1) when they came to the emergency room, Watson was speaking for A.J. and was very possessive of her; (2) Watson refused to leave the room while A.J. was being treated and got in the way of the doctors who were assessing her; and (3) when staff went to remove A.J.'s clothing for their trauma assessment, Watson would not allow them to cut off her clothes and wanted to remove them himself.

{¶ 25} Bruner said that Watson's behavior was unusual for family members visiting patients. Usually, family members will follow staff's directions to step aside or leave the room, but Watson "very much so was not." She also said that Watson was "verbally aggressive" with staff.

{¶ 26} Waldman was one of the practitioners who responded to the trauma call for A.J. She noted that A.J. had bilateral black eyes, swelling in her face, a cut on her lip, superficial abrasions on her feet, and some "other markings and abrasions on her extremities." A.J.'s bruises were purple and blue, which Waldman described as "[a]n acute or a fresh bruise[;]" older bruises have a "yellow-ish color." The medical staff placed A.J. in a C-collar in case she had a cervical fracture, and once they were sure A.J. was stable, they took her for a CT scan to make sure that she did not have any internal bleeding or fractures. The CT scan discovered an orbital wall fracture.

9.

{¶ 27} When Waldman responded to the trauma call for A.J., Watson was in the room. She described him as "very anxious and aggressive." She described A.J. as "very quiet" and said that Watson seemed to do the talking for A.J.

{¶ 28} When A.J. got to the CT scan room, Waldman was standing by her head. Waldman "looked her in the eyes" and said "you are safe now, if you need to speak you can speak now." In response, A.J. cried and admitted to Waldman that she was being abused. Waldman asked A.J. if she had actually fallen out of the car, and A.J. responded that she had jumped from the car because she was trying to get away from her husband. In response to A.J.'s admissions, Waldman had someone call police and alert the emergency room.

{¶ 29} When Waldman spoke to the police, she reported that A.J. told her that she was being abused by her husband, which "had started as when they were first married, and it wasn't the first time." The police also spoke to A.J. before staff took her back to the emergency room.

{¶ 30} While Waldman was talking to the police, Watson tried to come back to the CT scan room "trying to get to his wife and asking how she was . . . ." He was not allowed to be in there, and the police told him to go back to A.J.'s room and wait. Waldman had seen spouses act like that before, but said Watson's behavior was not normal. Specifically, she cited Watson talking over A.J. and answering all the questions for her. By the time A.J. returned to the emergency room, Watson was gone.

10.

{¶ 31} Waldman said that A.J.'s case "sticks out" because of Watson's demeanor and "everything that transpired and [A.J.] pleading to [Waldman] about what happened and how she's been being abused."

{¶ 32} On cross, Waldman denied that bruising was a symptom of A.J.'s chronic medical conditions, and said that she thought that the car A.J. jumped from was going 35 m.p.h.

**C. Officers' testimony**

{¶ 33} Macek and his partner were the officers who responded to UTMC's call about A.J. When they got to the hospital, A.J. was getting a CT scan. While they were waiting, Watson asked them "are you here for us," and Macek told him they were waiting to talk to someone in the room behind Watson. At that point, Watson was not "too upset." Eventually, hospital staff took the officers to the CT scan room to see A.J. While they were standing in the hall talking to UTMC staff, Watson came down the hall and started talking to them. He asked why the police were involved and "said that he was driving and that she fell out of the car." Watson was "a little more verbally aggressive" at this point. Despite the officers trying to send him back to the waiting area, he kept trying to talk to them. After the officers told him to wait and that they would talk to him later, Watson seemed "a little more" irritated and upset, but he finally walked away.

{¶ 34} The state played a brief clip of the video from Macek's body camera that showed this interaction. After watching the video, Macek described Watson as "a little irritated, little verbally aggressive, but he ultimately ended up walking back to the

11.

emergency room area . . . ." Macek believed that Watson was going to wait to speak with the officers. On cross, Macek said that he interpreted Watson attempting to talk to the officers after they told him, multiple times, to go back to the emergency room as "a little bit verbally aggressive . . . ." However, he also conceded that Watson could have just been concerned for his wife.

{¶ 35} When the officers spoke to A.J., she was upset and her "voice quivered[.]" She told them that Watson beat her, strangled her until she passed out, and strangled her again when she woke up. Watson eventually agreed to take her to the hospital but "took off" when they got there, and did not allow her to go in for treatment. A.J. also told them that she jumped out of the car after Watson drove away from the first hospital. Watson put her back in the car and beat her more while he was driving. They went back to their apartment, and Watson took her to UTMC when she complained of "body aches[.]" A.J. did not call 911 because Watson took her phone. She also told officers that she wanted to press charges against Watson. When A.J. said that she wanted to press charges, Macek asked her standardized questions designed to assess her need for further help; she answered "yes" to ten of the 11 questions. After speaking to A.J., the officers tried to find Watson, but he was gone.

{¶ 36} Fauver, a detective in the TPD domestic violence unit, testified that Macek and his partner called her to investigate a domestic violence incident that involved "some serious injuries[.]" The suspect possibly had prior domestic-violence convictions, which

12.

elevates the offense from a misdemeanor to a felony. Fauver identified two prior domestic-violence convictions that she linked to Watson.

{¶ 37} When she got to UTMC, Fauver spoke to Macek and his partner, and then spoke to A.J. The officers gave Fauver "[b]asically the same" version of events that A.J. "gave you guys." She took pictures of A.J.'s injuries, which she believed were "consistent with [A.J.'s] statements." She also reviewed the officers' body-camera video, and said that, although she did not base her decision to charge Watson solely on the video, the footage of Watson's aggressiveness toward hospital staff and the other officers bolstered her decision to charge him.

### D. Jail calls

{¶ 38} In addition to the testimony, the state played clips of several phone calls that Watson made while he was in jail. In the first, Watson told the other person (whom he called "Mooshy" or "Moochy," although which was not clear) to come to court dates and said that no one would know who she is. In the second, he told the same person not to do anything "crazy" while he was in jail.

{¶ 39} In the third clip, Watson told the other person that her name was "Mooshy" or "Moochy," which he explained by saying that someone thought he had contacted A.J., and said, "every time I call you I'm going to be talking about stuff to you, but . . . everything got to be [Mooshy/Moochy] . . . and I don't want them to think that I'm talking to somebody I ain't supposed to be talking to."

13.

**{¶ 40}** In the fourth clip, Watson referred to the other caller as "Mama." The other caller said she was at the library, and Watson confirmed that she was with Mooshy/Moochy. Watson told his mother that she could take something she had for the judge to the clerk of court's office rather than mailing it, and told her she should try to talk to someone while she was there.

**{¶ 41}** In the fifth clip, Watson called the other caller "baby" and "moo-moo" and told her that he loved her and did not want to lose her. He asked if she had done what she needed to do and if she had put "stuff" in the mail. The woman confirmed that it was "all taken care of."

**{¶ 42}** In the final clip, Watson's mother told him that she had taken "papers" to the clerk of court's and prosecutor's offices and mailed them to "the lawyer." Additionally, Watson recited a phone number belonging to Mooshy/Moochy that was no longer in service. According to the jail's call logs, the third and fifth clips came from calls between Watson and this phone number.

**{¶ 43}** After playing the jail calls, the state rested. Watson moved for a Crim.R. 29 acquittal, which the court denied.

### E. Watson's case

**{¶ 44}** Watson presented the testimony of Gwendolyn, his mother, as his only witness. Gwendolyn first testified about a letter that she wrote to the judge, prosecutor, and defense attorney. She wrote it at home and went to the library with A.J. to print it. In the letter, she explained that she has several significant medical conditions. Watson

14.

helped take care of her when he was living with her, and she had struggled since he had gone to jail. She went on to write that A.J. told her that Watson did not push A.J. out of a car, and "for the record no one made [A.J.] to tell [Gwendolyn] this [A.J.] said she had said a lot of things but also said it was not him."

{¶ 45} According to Gwendolyn, Watson and A.J. lived with her for three months when they were between apartments, though she could not remember the exact dates.

{¶ 46} Regarding the letter that A.J. wrote, Gwendolyn said that A.J. came to her house and told Gwendolyn that she was "ready to write a letter . . . to the judge about [her] husband . . ." because she needed help. They each handwrote a letter while sitting at Gwendolyn's kitchen table. When A.J. finished writing, she helped Gwendolyn write her own letter. After that, they went to the library to type and print the letters. A.J. also assisted Gwendolyn with this process. When they left the library, each woman had a copy of both letters. Gwendolyn immediately went to get her letter notarized. A.J. could not go with Gwendolyn because she had an appointment, but said that she would get the letter notarized after her appointment. She never did, however.

{¶ 47} Gwendolyn denied telling A.J. what to write, and, as far as she knew, A.J. wrote the letter and everything in it voluntarily and was not instructed or coerced by Watson or anyone else. The first time Gwendolyn heard anything about a letter was when A.J. came to her house on December 5 and mentioned writing a letter.

15.

**{¶ 48}** On cross, Gwendolyn said that A.J. did not tell her why she made up the story underlying these charges. She also admitted that Watson called both her and A.J. from jail, and said that his pet name for A.J. was "Boo-boo."

**{¶ 49}** After Gwendolyn testified, Watson rested.

### F. Outcome and appeal

**{¶ 50}** The jury found Watson guilty of third-degree-felony domestic violence. The trial court sentenced him to 36 months in prison.

**{¶ 51}** Watson now appeals, raising one assignment of error:

> I. THE TRIAL COURT ERRORED [sic] WHEN IT CONVICTED
> MR. WATSON AS THAT CONVICTION WAS AGAINST THE
> MANIFEST WEIGHT AND THE SUFFICIENCY OF THE EVIDENCE.

### II. Law and Analysis

**{¶ 52}** In his sole assignment of error, Watson argues that his conviction is not supported by sufficient evidence and is against the manifest weight of the evidence. He bases these arguments solely on the fact that A.J. wrote the letter recanting her allegations against him, which Gwendolyn testified to witnessing. He reasons that A.J.'s "recanting of the allegation against Mr. Watson means that the evidence presented by the state is both insufficient to sustain a conviction and his conviction is against the manifest weight of the evidence presented."

**{¶ 53}** The state responds that the evidence shows that A.J. had serious injuries, Watson was the person who injured A.J., and A.J. explained why she wrote a letter

16.

recanting her initial allegations, which is sufficient to support Watson's domestic violence conviction. It also contends that, when all of the evidence presented at trial is taken into consideration, the jury did not lose its way and create a manifest miscarriage of justice by finding Watson guilty, so his conviction is not against the weight of the evidence.

**A. Watson's conviction is supported by sufficient evidence.**

{¶ 54} We first consider whether Watson's conviction is supported by sufficient evidence. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In making that determination, we will not weigh the evidence or assess the credibility of the witnesses. *State v. Were,* 2008-Ohio-2762, ¶ 132. "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.* Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).

{¶ 55} Watson was convicted of domestic violence under R.C. 2919.25(A), which requires the state to prove that the defendant knowingly caused physical harm to a family or household member. A defendant acts "knowingly" when, regardless of his purpose, he

17.

is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). "Physical harm" includes "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). A spouse or former spouse who has resided with the defendant is a "family or household member." R.C. 2919.25(F)(1)(a)(i).

{¶ 56} At trial, A.J. testified that she and Watson were married and had lived together; Watson beat her at their apartment over the course of several hours; Watson took her to the hospital for treatment, but changed his mind when they got there, which prompted A.J. to jump from their moving car; and after Watson put her back in the car, he beat her again. When he finally allowed her to enter a hospital, two of the medical providers who worked on A.J. said that Watson would not let her answer questions, did not follow their instructions and was in the way, and behaved in a manner not typical of a concerned family member. The medical providers and investigating officer described Watson as "verbally aggressive" and "irritated" during their interactions with him. They also said that A.J. named her husband as the perpetrator. Watson left the hospital while A.J. was in the CT scan room, after the officers told him to wait in the emergency room. The medical records showed that A.J. had a fractured orbital bone, some scrapes on her foot, and bruising on her face. Waldman said that A.J.'s bruises were purple and blue, which indicated that they were fresh.

{¶ 57} To counter this testimony, Watson relied on the letter that A.J. wrote, in which she claimed that Watson did not hurt her and blamed her injuries on another,

18.

unnamed man. Gwendolyn testified that writing the letter was A.J.'s idea, and that no one coerced A.J. or told her what to write. A.J. said that she wrote the letter because she was pregnant and trying to keep her family together, Watson told her to write it (and told her what to write), she did not send the letter to the judge or attorneys, and she talked to the prosecutor four days later to tell her about the letter and explain that it was false.

{¶ 58} Based on this evidence, a rational trier of fact could have determined that Watson knowingly caused physical harm to A.J., his wife. There is plenty of evidence that A.J. suffered physical harm. A.J.'s testimony and her statements to UTMC staff and TPD officers the day she was beaten also show that Watson was the person who caused the physical harm. The core of Watson's argument—that the credibility of A.J.'s testimony is questionable—does not affect the outcome of our analysis because we do not consider the credibility of witnesses when reviewing the sufficiency of the evidence. *Were,* 2008-Ohio-2762, at ¶ 132; *see also State v. Pratts*, 2016-Ohio-8053, ¶ 49 (8th Dist.) (Witness's "recantation goes to the manifest weight of the evidence, not sufficiency."). Accordingly, we find that Watson's conviction is supported by sufficient evidence.

**B. Watson's conviction is not against the manifest weight of the evidence.**

{¶ 59} Turning to Watson's manifest-weight argument, we likewise find that it is without merit. When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way in

19.

resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387. We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *id.* Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 60} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the jury's credibility determinations, given that the jury had the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). The jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 2008-Ohio-1557, ¶ 62 (6th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 61} After carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against a conviction. To be sure, A.J.'s apparent recantation of her accusations against Watson raises questions about her credibility, and

20.

Gwendolyn's testimony undermined some parts of A.J.'s story. But A.J. provided a plausible explanation for her conduct, there is no evidence—other than "moo-moo" saying on a jail call that the mailed "stuff" Watson asked about was "all taken care of"—that she tried to get the letter or its content to the court or attorneys, and she contacted the prosecutor four days after writing the letter to tell the prosecutor about its existence and that its content was false. On the whole, the evidence does not show that A.J.'s credibility is so lacking that it undermines Watson's conviction. And we must extend special deference to the jury's credibility assessment because the jury actually saw and heard A.J. and Gwendolyn testify. *Fell* at ¶ 14. Additionally, the UTMC staff and TPD officers each testified that A.J. gave them a version of events that was consistent with her trial testimony. These witnesses also said that Watson's behavior was not typical of a concerned spouse, which they found suspicious or concerning.

{¶ 62} On balance, we cannot say that the jury lost its way or created a manifest miscarriage of justice by believing A.J.'s testimony about Watson beating her, despite the issues with her credibility. We find, therefore, that Watson's conviction is not against the manifest weight of the evidence.

{¶ 63} Watson's assignment of error is not well-taken.

21.

### III. Conclusion

**{¶ 64}** For the foregoing reasons, the March 24, 2023 judgment of the Lucas County Court of Common Pleas is affirmed. Watson is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.            _____

                                          JUDGE

Gene A. Zmuda, J.           

                                       _____

Charles E. Sulek, P.J.                                          JUDGE
CONCUR.

                                       _____

                                          JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.