[Cite as *State v. Sherman*, 2024-Ohio-5354.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-23-1168

    Appellee                              Trial Court No.  CR0202201309

v.

Robert Sherman                          **DECISION AND JUDGMENT**

    Appellant                             Decided:  November 8, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}** Appellant, Robert Sherman, appeals the June 16, 2023 judgment of the

Lucas County Court of Common Pleas sentencing him following his conviction of

aggravated murder, robbery, domestic violence, having weapons under a disability, and

endangering children.  Because the trial court did not err in denying Sherman's motion to

suppress, the state presented sufficient evidence identifying Sherman as the perpetrator,

and the trial did not reach its verdicts by improperly stacking inferences, we affirm.

## I. Background and Facts

{¶ 2} On February 24, 2022, the state charged Sherman with crimes related to assaulting, robbing, and murdering A.D., the mother of his children. The indictment alleged one count each of domestic violence in violation of R.C. 2919.25(A), (D)(1), and (D)(3), a fourth-degree felony; robbery in violation of R.C. 2911.02(A)(2), a second-degree felony; aggravated murder in violation of R.C. 2903.01(B), an unclassified felony; murder in violation of R.C. 2903.02(A), an unclassified felony; and having weapons while under disability in violation of R.C. 2923.13(A)(2), a third-degree felony; and two counts of endangering children in violation of R.C. 2919.22(A), each a first-degree misdemeanor. The aggravated murder and murder charges each included firearm specifications under R.C. 2941.145(A), (B), (C), and (F).

{¶ 3} The charges against Sherman stemmed from two separate incidents involving A.D. The domestic violence and robbery charges arose from an incident on February 13, 2022, and the remaining charges related to A.D.'s murder on the night of February 14, 2022.

### A. Motion to suppress

{¶ 4} Before trial, Sherman filed a motion to suppress an identification of him a neighbor of A.D.'s made from a photo array, which he claimed "was conducted in an inherently suggestive manner." He generally argued, without providing any specifics, that "the circumstances surrounding the identification made were unduly suggestive[,]"

2.

and because the underlying identification was unreliable, claimed that "all evidence of identification must be suppressed."

{¶ 5} In its response, the state explained that officers investigating A.D.'s murder learned from two of her neighbors that they had seen her arguing with a man in the days leading up to her murder. Sherman became a suspect in A.D.'s murder based on the neighbors' description. Toledo Police Department ("TPD") detective Danielle Mooney created a photo array that included Sherman's picture. One of the neighbors, Keshaun Hayes, chose a photo from the array that was not Sherman's and "was only about '75% sure of his selection.'" The other neighbor, Mary Evans, chose Sherman's photo and said that the man in the picture was "'the one [she] saw in the apartment with [A.D. She's] damn near positive. One hundred percent sure it is him.'"

{¶ 6} The state argued that the court should not suppress Evans's identification because the process used to obtain the identification was not unduly suggestive. It claimed that the pictures used in the array "all depict men of similar age, race, skin tone, eye color, height, weight, scalp hair, facial hair and overall build[,]" and detective Roy Kennedy of the TPD, who showed Evans the array, was a blind administrator and "was unaware of [Sherman's] identity and location in the array, and therefore could not have suggested to [Evans] which photograph to select."

{¶ 7} At the suppression hearing, the state called Mooney and Kennedy to testify.

{¶ 8} Mooney testified that detective Gary Bunting, the lead investigator on the case, asked her to create a photo array that included Sherman. TPD uses the "Lucas

3.

County Mug Shot Program" to create photo arrays. When Mooney creates an array, she "input[s] certain information into that program, and it auto-populates persons that may fit the parameters that you're looking for . . . ." She can search by "sex, age, facial hair, race, weight, sideburns, hair, height, glasses, and eye color." After searching by a general parameter, like hair color, she is able to narrow the search by looking for something more specific, like hair type.

{¶ 9} To create the array in this case, Mooney searched for black males with black hair styled in medium length "dreads" who had "goatee type facial hair . . . ." She was not looking for any other specific physical identifiers; she was "just trying to find five other people that fit the general description of Mr. Sherman, and then to not, you know, predispose [Sherman's] picture to be chosen for anything different from the other five photos."

{¶ 10} On cross-examination, Mooney said that she was given a photo of Sherman, not a description of him, which she used to find the other pictures for the array. His picture was taken at the end of January 2022, just weeks before A.D. was murdered. The color of the men's complexions was one of the factors Mooney considered while constructing the array. She thought that all five of the men in the array had skin tones that were "similar" or "very close" to each other's and Sherman's and did not "think one is extremely different than the other." The other men's ages were all within ten years of Sherman's age. Mooney thought that Sherman had "patches" of facial hair on his cheeks,

4.

but not "full facial hair[,]" and saw "facial hair on the side of . . ." the faces of the men in three other pictures.

{¶ 11} Although the mugshot program generates the initial photos based on the parameters Mooney provides, she is able to go through the generated photos to choose the ones that most closely resemble the suspect. She said that another detective could have created an entirely different array based on Sherman's photo.

{¶ 12} Kennedy testified that he was asked to show Evans the photo array. He was a blind administrator, which means that he did not know who the suspect was or which photograph in the array was the suspect's.

{¶ 13} Kennedy showed Evans the array at her apartment. Before showing her the photographs, he read her a standard form asking her to review the photos in the array to see if she could identify any of them as the suspect who committed the crime. The form also explained that she was not required to choose a picture from the array and that the suspect's picture may or may not appear in the array. When Kennedy showed Evans the pictures, she chose the person in photo number four as the suspect. Kennedy recorded her comments as, "number four is the one I saw in the apartment with the victim . . . . I'm damn near positive . . . . 100 percent sure it's him . . . ." Kennedy did not know who the suspect in the case was and did not suggest that Evans choose the person in photo four.

{¶ 14} At Kennedy's request, officer Corey Morgan recorded Kennedy's administration of the photo array on his body camera. In the video, Evans chose photo number four after looking at the array for less than ten seconds. When Kennedy asked

5.

her, "What about number four[,]" she responded, "That's the guy I seen in this apartment with the victim." As Kennedy was completing the photo array form, he asked Evans, "How sure are you that it was number four?" She responded, "I'm damn near positive because the acne, that—that stood out when I seen him." When Kennedy asked her to "assign a percentage," she told him that she was "a hundred percent." Although Kennedy wrote on his array form that Evans "stated '100% sure it's him[,]'" he told Evans in the video that he was "paraphrasing a little bit" in his notes. However, Evans confirmed that what Kennedy had written was accurate before signing the form.

{¶ 15} On cross, Kennedy admitted that he did not ask Evans when she had seen the person in photo four at the apartment with A.D. Based on Evans's comment in the video that the person's acne stood out to her, defense counsel asked Kennedy if anyone one else in the array "had a bad acne problem[.]" Kennedy responded, "no, but . . . it looks almost like artifact . . . on the number four picture. So I would not be clear it was actually acne." Regardless of whether Kennedy thought that Sherman appeared to have acne in his picture, he agreed with counsel that none of the other men appeared to have acne.

{¶ 16} In response to questions from the court, Kennedy clarified that "artifact" referred to "pixilation" of a digital photo or when the photo "is just not clear" and can look like "spots [or] marks." There were two other photos in the array that appeared to have marks on them that could have been artifact or some physical marker on the

6.

person's face, like facial hair or spots, but it was "not obvious exactly" and Kennedy could not "say with certainty" what the marks were.

{¶ 17} The trial court denied Sherman's motion to suppress. In its decision, the court determined that Sherman did not meet his burden of showing that the photo array was unduly suggestive because his picture was the only one with acne. Although the court found that Sherman's "complexion in the photo array appears to be somewhat different than the other five persons in the array[,]" it was not "entirely clear" from the pictures if the spots on Sherman's face were "acne sores, scars, variations in skin pigmentation, or even digital photo noise anomalies." Because of that, Sherman had failed to show that the spots were "sufficiently unique, distinctive, or substantially different . . ." to make the array unnecessarily suggestive. The court also found that it was "not entirely clear from the context . . ." of Evans making the statement that "'I'm damn near positive, the acne stood out when I seen him'" whether she was "saying that the suspect's acne stood out when she previously witnessed him or whether the spots stood out in [Sherman's] photograph." But the court believed that Evans's "use of the past tense 'seen' strongly suggests that Ms. Evans was speaking of her prior observation of the suspect." However, Sherman did not explore this point at the hearing, so he failed to show that "the facial spots on his photograph steered the witness to him independent of her honest recollection."

7.

## B. Trial

{¶ 18} Sherman's case was tried to the court. The state presented the testimony of 22 witnesses. Germane to our analysis is the testimony of Mertes Darrington, A.D.'s mother; Royston Williams, a maintenance worker at A.D.'s apartment complex; Ali Ismail, the owner of a local car dealership; Timothy Hensley, the manager of a local gun store; Evans, A.D.'s neighbor who identified Sherman in the photo array; Julie Altizer, a forensic scientist with the Ohio Bureau of Criminal Investigation; TPD officers Morgan, Lindsey Erhart, Lucas Snowberger, Jeffrey Jackson, and Benjamin Kiser; sergeant Melvin Haney; detectives Kennedy, Bunting, Jon Gruenberg, Kristi Eycke, and George Kral; and the administrator of the TPD forensics laboratory, David Cogan.

{¶ 19} Due to an unexpected continuance, rather than having the coroner who conducted A.D.'s autopsy testify in person, the parties stipulated to the admission of his CV, the coroner's report he prepared, his autopsy photographs, and his autopsy diagrams.

{¶ 20} Sherman called his brother, Khiry Henderson, to testify, but Henderson invoked his Fifth Amendment right against self-incrimination and refused to answer any questions. Sherman also recalled Bunting to testify and called Hayes, A.D.'s neighbor who did not identify Sherman in the photo array.

### 1. Background testimony

{¶ 21} Darrington, A.D.'s mother, testified that A.D. was 24 years old at the time she died and had two children, a three-year-old daughter and a two-year-old son. Sherman is the children's father.

8.

**{¶ 22}** A.D. and Sherman were involved in some type of relationship for "a year or two" before their daughter was born in late 2019. They "never had a house together, but they were staying together at hotels."

**{¶ 23}** In April 2020, A.D., Sherman, and their daughter were staying at a hotel on Secor Road. A.D. was pregnant with their son at the time.

**{¶ 24}** Snowberger and his partner were dispatched to a domestic violence call at the hotel. When they arrived, they found A.D. and her child in the lobby. She looked "[w]ithdrawn . . . she had a thousand yard stair [sic]. She was not with it, kind of anguish, dealing with what just happened." She reported that she had been in an argument with Sherman, the father of her child, that turned physical when A.D. refused Sherman's request that she rent a car. She also told the officers that "she got hit in the mouth resulting in bloody lips, and . . . she had a phone in her right hand when the father of her child snatched it, or took it away, causing a scratch to her right arm, thumb area, right hand area."

**{¶ 25}** The state submitted the video from Snowberger's body camera as an exhibit. On the video, when Snowberger asked A.D. what happened, she told him that "Robert Sherman," her baby's father, hit her. He got mad at her when she would not get him a rental car and "told me if I call the police this time, he was gonna to kill me . . . kill me if he goes to jail."

**{¶ 26}** A.D. called Darrington to the hotel, and when she arrived, she found A.D. in the lobby talking to police and saw that A.D.'s "lips was busted, and [Darrington] had

9.

to take her to the hospital." The state offered into evidence a certified copy of a judgment entry showing that Sherman was arrested, convicted of fifth-degree felony domestic violence, and incarcerated as a result of this incident.

{¶ 27} While Sherman was incarcerated, Darrington said that A.D. "was doing well. She obtained her own place. She was in the process of getting a vehicle. She had the other baby. She was happy." Darrington did not know of A.D. being romantically involved with anyone while Sherman was incarcerated.

{¶ 28} Sherman was released from prison ten days before A.D.'s murder. Darrington described A.D. as "[s]ad" after Sherman's release.

{¶ 29} Evans testified that A.D. was one of her neighbors for about a year. Their building had four units in it; A.D. lived upstairs and on the opposite side of the building. Evans also met Darrington while A.D. lived in the building. Until February 2022, Evans could not hear A.D. unless she and the children were on the shared stairs. She did say, however, that there were noise complaints regarding A.D. before February 2022. Evans did not see A.D. with her own vehicle before February 2022.

{¶ 30} Things changed with A.D. in February 2022. After that, A.D. "was into a lot of arguing. And [Evans] could hear it. . . . [She] went upstairs to see a couple times what was wrong." Evans asked if A.D. needed her "to call the police or something because it was that bad[,]" but A.D. refused. During that month, Evans saw a man, who she identified in court as Sherman, coming to A.D.'s apartment. Sherman drove a silver or gray "truck" that he parked outside of Evans's window. She later clarified that the

10.

"truck" was an SUV, not a pickup truck.  Her attention was drawn to the vehicle because he parked it "[b]ackwards," with its bumper toward Evans's window, which the building manager did not allow.

{¶ 31} On cross-examination, Evans said that she could hear A.D. "hollering" and a second voice that "sounded like a male."  The day Evans went to A.D.'s apartment because of the arguing, she did not call the police, but she did call Darrington.  Although the police came to the building "a couple times[,]" Evans did not remember seeing them the day she called Darrington and did not know if someone else called them that day.  She did not remember seeing A.D. riding in or driving the gray or silver SUV.  The SUV was parked with its back bumper toward her window "[a] few times . . . [n]ot always."

## 2. February 13, 14, and 15

{¶ 32} On February 13, 2022, A.D. called 911 to report that she needed help at her apartment because she had been assaulted and robbed by Robert Sherman.  She also called Darrington to pick her up from the apartment.

{¶ 33} The state offered the 911 call as evidence.  The call begins with a woman yelling unintelligibly and then saying, "I told him to stop."  The caller, who later identifies herself as A.D., does not answer the dispatcher's questions, and the line goes dead about 15 seconds into the call, likely because the call was disconnected.  When the call resumes about 20 seconds later, a child is crying in the background, and A.D., who sounds distressed and like she is crying, says that she wants to report a robbery that started with domestic violence.  She tells the dispatcher that "Robert Sherman," her

children's father, hit her, threw her to the ground, was no longer there, and was not supposed to be around her. When the dispatcher asks if Sherman could get back into the apartment, A.D. says that "he might have took [her] key." Soon after, she definitively says that "he took [her] key."

{¶ 34} Erhart responded to A.D.'s 911 call on February 13. She and her partner were given a description of a suspect named Robert Sherman, a black male wearing all black and driving a gray Dodge Journey. Surveillance video from A.D.'s apartment complex shows that Erhart and her partner got to the building about 20 minutes after A.D. called 911.

{¶ 35} Erhart found A.D. and her two children, who were two and three years old, at the apartment. Erhart said that A.D. was "visibly upset about something" and appeared to be "upset, but did not really want to talk to . . ." the officers. There were no adult men in the apartment while the officers were there, and A.D. was not able to show them her apartment key when they asked about it.

{¶ 36} In her report, Erhart noted that A.D.'s statements at the apartment recanted her statements on the 911 call. No formal charges were filed as a result of this incident.

{¶ 37} On cross, Erhart said that A.D. was not crying, Erhart did not see any bruises on her, A.D.'s clothing was not torn, and the apartment was not in disarray. She explained that she asked A.D. for her key because A.D. reported on the 911 call that "he had taken the apartment key."

12.

{¶ 38} Erhart conceded that A.D. spoke to the officers to tell them that she was fine, she and Sherman just had a heated argument, she was lightly pushed, and Sherman did not steal her key. When Erhart asked A.D. about her key, A.D. said that she did not know where it was. Erhart did not put the information about A.D.'s key in her report, but later said that the inquiry was recorded on her partner's body camera.

{¶ 39} Darrington got to the apartment while the police were there and confirmed that Sherman was not there. After the police left, Darrington took A.D. and the children to her apartment, where they stayed the night. A.D. was not able to lock the apartment door when she left.

{¶ 40} The next morning, on February 14, A.D. went to her apartment to get some clothes but could not get in because the door was locked. Williams, a maintenance worker at A.D.'s apartment complex, testified that A.D. placed a work order for a lock change on February 14. He completed the lock change around 1:45 to 2:00 p.m. Williams had to follow A.D. to her apartment with a key because her door was locked. He used his key to open the door and saw a man sitting in the dining room. The man "said to [A.D.] who the F is that?" Williams "just got a fleeting glimpse of [the man's] face[,]" but thought that he was African American.

{¶ 41} On cross, Williams said that he would not be able to recognize the man from A.D.'s apartment but knew that the man "[h]ad a beard" and a "much lighter" complexion than Williams's.

13.

{¶ 42} A.D. went back to Darrington's apartment after that, and Darrington took her home around 3:00 p.m. She last heard from A.D. around 6:00 p.m.

{¶ 43} On the morning of February 15, Darrington "kept calling" A.D., who did not answer. She and A.D. usually communicated frequently throughout the day, so Darrington was "worried about her, and [she] called the police to do a well check to make sure [A.D.] was okay."

{¶ 44} The second 911 call the state submitted, from February 15, 2022, was a "check safety" call at A.D.'s apartment, which is done based on someone's concern for another person's safety. In the call, the caller, who did not want to provide their name, asked for someone to check on A.D. because "she has a abusive boyfriend, and her door's wide open, and I just think something could be wrong with her . . . ."

{¶ 45} Darrington also called Evans, A.D.'s downstairs neighbor, "[t]o ask if she heard anything. [Darrington] also asked her to go upstairs and see if the door was locked so that [Darrington] would know if [A.D.'s] in there . . . ." Evans said that she went upstairs and "knocked on the door, [it] came open, and I—I was going to go in but I didn't. So I called from upstairs and told [Darrington] that I think something was wrong and that she need to come and call the police . . . ."

{¶ 46} On cross, Evans said that A.D.'s apartment door came open when she knocked on it; she did not turn the doorknob. She stood at the door and continued her conversation with Darrington, but did not go into the apartment.

14.

{¶ 47} After Darrington spoke to Evans, she went to A.D.'s apartment. She arrived at the same time as the police and saw that the door to the apartment was unlocked. The police would not let her into the apartment, but officers went in and brought A.D.'s children out. Darrington said that the children "were wet and everything. [She was] sure they were hungry . . . they didn't respond a lot . . . ."

### 3. Investigation

### a. Crime scene and autopsy

{¶ 48} Morgan was one of the officers who responded to the check safety call at A.D.'s apartment on February 15. He and his partner arrived at the apartment at 11:42 a.m. When they entered the apartment building, some of A.D.'s neighbors were in the hallway and explained to them why someone had called for a safety check. The officers knocked on A.D.'s door several times but got no response. Based on the information the neighbors provided, Morgan checked with his sergeant to see if he and his partner could enter the unlocked apartment, which the sergeant approved.

{¶ 49} Once they were in the apartment, Morgan and his partner found A.D.'s body lying on the bed in a bedroom. There were two small children on the bed with her, a little boy who was awake and sitting near her head and a little girl who was asleep and lying down against her. The officers picked up the children and took them out to Darrington, who had arrived at the apartment building around the same time as Morgan. He described Darrington as "very upset and distraught, . . . more like hysterical at that point."

15.

{¶ 50} Morgan also accompanied Kennedy when he showed Evans the photo array to record their interaction on his body camera.

{¶ 51} The state submitted video from Morgan's body camera as an exhibit. The footage does not include audio, but shows Morgan talking to Evans when he and his partner arrive at A.D.'s apartment building, a person across the hall talking to Morgan's partner as his partner stands outside A.D.'s closed apartment door, Morgan's partner trying the doorknob, Morgan going to his patrol car to make a phone call, Darrington pulling into the parking lot and going into A.D.'s building, Morgan and his partner finding A.D. and the children in the apartment, the officers taking the children to Darrington, and Darrington's reaction to whatever Morgan said to her.

{¶ 52} On cross, Morgan said that the door was closed when they got to the apartment. His partner was the one who knocked on the door, and he was not sure if his partner tried the doorknob before getting permission from their sergeant to enter the unlocked apartment.

{¶ 53} Jackson was one of the officers responsible for processing the crime scene. By the time he arrived, other officers had already determined that this case involved a shooting, found shell casings in the room with A.D.'s body, and knew that the apartment's locks were recently changed due to threats A.D. may have received.

{¶ 54} Jackson reviewed some of the photographs that he took in the apartment. He noted that there was no damage to the door frame of the exterior door, indicating that there was no forced entry into the apartment.

16.

{¶ 55} In the living room, he found an empty blue plastic carrying case for a Girsan 9 mm pistol sitting on the shelf of an entertainment center. Jackson did not find the gun that went in the carrying case.

{¶ 56} Jackson found two boxes of ammunition in a kitchen cupboard. The first box said that it was Sierra brand 9 mm cartridges, but it contained Sig brand 9 mm Luger cartridges. The box could hold 20 cartridges but only contained five. The second box said that it contained Red Army Standard brand 7.62 x 39 mm cartridges, but it contained four Tulammo brand 7.62 x 39 mm cartridges.

{¶ 57} On the kitchen table, Jackson found A.D.'s purse, which "did not appear disturbed." He noted that in particular because "if it's a break-in or a robbery type thing you would expect that the things would be—have been gone through, have been searched. We often will see purses dumped out looking for items within the purse." Jackson would expect to see "some disarray" at a robbery scene, but said, "[w]e didn't have any of that. Everything appeared to be in place and undisturbed." Additionally, there was a laptop on the bed next to A.D.'s body. Like A.D.'s purse, this was an item of value that was not taken from her apartment following her murder.

{¶ 58} Jackson also found "a handwritten note or list on a piece of notebook paper . . ." on the kitchen table titled "To Do List" that included items like (1) "Apt. complex dat allow pets[;]" (2) "Get a dog[;]" (3) "Find hit equipment[;]" (4) "Have sister get strap for you[;]" (5) "Lawsuit (State Pay was origanally [sic] $18 & I got $17[;]" (6) "Free

Medical for 6 months after I get out[;]" (7) "Sniper Rifle[;]" and (8) "Find out how to break down Gun so u can ride w/ it."

{¶ 59} In the bedroom where officers found A.D.'s body, Jackson found five Tulammo 7.62 x 39 mm shell casings. Because there were five shell casings in A.D.'s bedroom, Jackson "assume[d] that there were five shots fired." They were next to, on top of, and behind an entertainment center that was approximately three feet from the bed where A.D.'s body lay, on the floor next to the bed, and on top of the baseboard heater along the wall at the head of the bed. The cartridges were all "concentrated in the corner [of the room] adjacent to [A.D.]." Jackson explained that "[v]irtually all firearms eject up and to the right, which if you put the shooter standing in the room near the victim and firing that[,] those casings would be coming up and hitting the walls in that corner of the room and falling into that area likely." The TPD lab examined these casings for fingerprints but were unable to find any. They also swabbed the casings for DNA. While he was examining the casings for fingerprints, Jackson noticed that "on visual examination the fire pin impressions appeared visually the same. So everything appeared to be from a single firearm, single shooter as opposed to multiple."

{¶ 60} According to the coroner's verdict that the state submitted in place of the coroner's testimony, A.D. died of multiple gunshot wounds and her manner of death was "Homicide – SHOT BY ANOTHER PERSON(S)." The coroner found five high-velocity gunshot wounds to her body. The first entered on the right side of A.D.'s face and exited

18.

"posterior to angle of jaw and perforated left ear lobe."[1]  The second entered "posterior right upper arm," exited from the top of her right shoulder, grazed the tip of her left ring finger, breaking the fingernail, reentered "anterolateral left thumb," re-exited "dorsolateral left thumb," reentered on the right side of her face, and finally exited through her left upper back at the base of her neck.  There was an area of stippling on her left hand that was "consistent with [A.D.] laying in bed on her left side with the left elbow flexed across her body, and the left hand resting against the right side of the face."  The third shot entered A.D.'s body "posterior right upper arm," exited "right axilla," reentered "right axilla," and exited through her left upper arm.  The fourth shot entered the back of her right upper arm, just above her elbow, and exited "right antecubital fossa."  The fifth shot entered the mid-back of her right forearm and exited "anterior distal right forearm."  The coroner determined that the first gunshot was from close range and the other four were from "distant/indeterminate" range.  In addition to the bullet entrance and exit wounds, the coroner found, "typical of high velocity gunshot wounds, there were multiple bony exits or bullet fragment exits . . . on the anterior left shoulder, left upper back/posterior left shoulder, and left upper chest[.]"

{¶ 61} The gunshots caused extensive injuries to A.D.'s body including lacerations and hemorrhaging where bullets traveled through her body, "basilar skull fracture involving the left middle fossa, diffuse subarachnoid hemorrhage, mild bloody

---

[1] The coroner noted that the gunshot wounds in his report were "arbitrarily numbered for ease of description . . . [,]" which did "not reflect the sequence of occurrence."

aspiration into both lungs[,]" fractured left and right humeri and right ulna, and hemorrhaging of the soft tissue of her paracervical spine. The coroner did not find any abnormalities in A.D.'s body beyond the damage the gunshots caused.

**b. Gun store evidence**

{¶ 62} Hensley, the general manager of a local gun store, produced an invoice and background check paperwork for purchases A.D. made on February 7, 2022. The invoice shows that she bought a European American Armory Girsan MC28 9 mm handgun, a Century Arms Mini Draco handgun, a box of Red Army Standard 7.62 x 39 mm ammunition, and a box of Luger 9 mm hollow point ammunition. He said that the Girsan is "a handgun, a small compact[,]" the Luger bullets are ammunition for the Girsan, the Mini Draco, although it is "considered a handgun, . . . is much, much larger[,]" and the Red Army Standard bullets are ammunition for the Mini Draco.

{¶ 63} The prosecutor showed Hensley a Facebook photograph of a seated man wearing a black hoodie with the hood pulled up and a white Nike logo on the left breast, black sweatpants, tan boots, and a surgical mask and holding two guns. Hensley said that it appeared that the man in the picture had "a Century Arms Mini Draco and a titanium colored MC28" in his lap, which were consistent with the guns A.D. bought on February 7. Regarding the man's clothes, Hensley thought that the "white patch seems to match what is on the video, and the shoes and pants[,]" i.e., that the man in the photo was wearing clothing that "appear[ed] to be consistent" with the clothing the man with A.D. at the store on February 7 was wearing.

20.

{¶ 64} The state submitted surveillance video from the gun store into evidence. The video shows a dark blue Ford Edge pulling into the store's parking lot just after noon on February 7. After a few minutes, A.D. gets out of the back seat, a man wearing a black hoodie with the hood up, black pants, tan boots, and a surgical mask gets out of the front passenger seat, and they walk inside. The cameras inside the store clearly show that the man's sweatsuit has Nike logos on the left breast and left hip areas. While they are waiting after A.D. and the man browse and A.D. makes her selections and fills out her paperwork, the man puts his arms around A.D.'s waist, pulls her toward him, and embraces her. After completing her transactions, A.D. and the man leave the store and get back into the dark blue Edge. The video shows that the back hatch of the Edge has light-colored areas in the lower left corner of the rear window, the left side of the tailgate near the taillight, and the right side of the tailgate near the taillight.

{¶ 65} On cross, Hensley confirmed that he was not saying that the person in the Facebook picture and the store surveillance video were the same man; he was only saying that they were similarly dressed. He did not have any personal contact with the person in the store with A.D. and could not determine any identifying features such as complexion, facial hair, height, or weight from the video.

{¶ 66} As part of his investigation, Kral, a detective with the TPD's crime gun intelligence center task force ("CGIC"), learned about A.D. buying the two firearms about a week before her death and went to the gun store to review its surveillance video. In the video, Kral saw a dark-colored Ford Edge pull into the store's parking lot and its

21.

two passengers go into the store. He noted that the front seat passenger was wearing a black sweatsuit, tan or brown boots, and a mask. He found the passenger's clothing significant because "[i]t's the same believed to be worn by Mr. Sherman on the Facebook photo."

### c. Car dealership evidence

{¶ 67} Ismail, the owner of a local car dealership, testified about the sale of a gray Dodge Journey in early February 2022. He recalled that "a couple came in, and they purchased the vehicle together. It was put in the female's name, and there was a male with her." He thought that A.D.'s name sounded familiar and thought that she purchased the Journey the weekend before Valentine's Day. Ismail described the man with A.D. as "taller" and African American, but said he was "wearing a mask so it was kind of hard to describe more than that" and "[y]ou are talking February so there is plenty of clothes to kind of shield exactly what he looks like." Ismail thought the man was wearing a "winter mask, but then again it was COVID time so it might have been a surgical mask."

{¶ 68} On February 14, a man brought the Journey back to the dealership because of an issue with its window. Ismail said that the person who brought the SUV back "looked like the person who was in the office when the vehicle was purchased." In the surveillance video from the dealership's office, the man who brought the vehicle in for service said that there was an issue with the "right back door." The dealership repaired the issue with the door that day.

22.

{¶ 69} On cross, Ismail said all he knew about the person with A.D. when she purchased the Journey was that "he was wearing a mask," "he was African American[,]" and Ismail only saw his eyes. Ismail could not describe the man's eyes, did not know if the man had facial hair, and could not recall the man's skin tone. However, he said, "I do recall if not the exact same traits very similar traits to the same person who walked in[,]" by which he meant "the build, and demeanor, figure." He also said that the "cheekbones look the same" even under a mask because "you can see indentation." The man who came in with the Journey on February 14 was wearing the "[s]ame thing" as the man who was there to purchase the Journey.

{¶ 70} Ismail admitted that the woman in the surveillance video who was "watching the office for [him]" spent much more time with the man who brought the Journey to the dealership on February 14 than he did. When defense counsel asked if the person in the February 14 video was the same person from before, Ismail replied, "I believe so. I don't know . . . ." Ismail agreed that it was "fair to say" that, as counsel put it, he could "say that it looked like the person, but [he] can't tell this Court that that was the same person that came in to purchase that car . . . [.]"

### d. Apartment surveillance video

{¶ 71} Officers collected surveillance video from A.D.'s apartment complex from February 13 and 14. The videos from the apartment complex's parking lot came from a camera that was located over a building adjacent to A.D.'s. The parking lot immediately in front of A.D.'s building is at the far-right side of the camera frame. Although the

23.

bushes flanking the doorway to A.D.'s building are visible in the frame, the doorway itself is not. That area is clearly visible during the day but is not well lit and is mostly dark at night.

{¶ 72} The February 13 video shows two people walking out from between the bushes in front of A.D.'s building at 3:50 p.m. Both are carrying children and wearing surgical masks. They walk up to a gray SUV. The person wearing all black, possibly with a hood on, and tan boots puts a child in the back driver's-side seat before getting in the driver's seat. The person in a dark top and light pants, who is later identified as A.D., puts a child in the back passenger-side seat. A.D. tries to close the back door several times but is unsuccessful. When she cannot get the door to close, the person in the driver's seat gets out and walks over to look at the door. The person spends about five minutes trying to fix the door before giving up and walking back to A.D.'s building. A.D. gets the children out of the SUV and walks back to her building at 3:57 p.m.

{¶ 73} Just over two minutes later, a person wearing all black, possibly with a hood on, tan boots, and a surgical mask walks out of A.D.'s building and gets into the gray SUV. As the person gets into the car, A.D. walks out of her building. She appears to be on the phone. Although the person in the SUV had started to pull out of the parking spot, when they see A.D., they stop and open the car door. A.D. turns around and goes back into the building. At that point, the person in the SUV leaves the parking lot. The SUV left the parking lot at 4:00 p.m. According to the 911 call logs, A.D.'s call came in at 4:00 p.m.

24.

{¶ 74} The first of two videos from February 14 shows a man wearing all black, possibly with a hood on, tan boots, and a surgical mask walking out of A.D.'s building, getting into a gray Dodge Journey backed into a parking space in front of the building, and driving away around 3:15 p.m.

{¶ 75} The second February 14 video, from shortly after 9:00 p.m., shows a dark-colored, possibly gray, SUV that appears to be a Dodge Journey pulling into the parking lot and driving toward A.D.'s building.[2]

{¶ 76} The SUV backs into a parking spot at the far right of the camera frame in an area that is mostly dark. About two minutes later, a person walks from the area of the SUV's driver's door toward A.D.'s building and walks between the bushes flanking the door before leaving the frame. As the person is walking between the bushes, there is sufficient light to see that they are wearing dark clothing and what appears to be a surgical mask.

{¶ 77} Around 10:20 p.m., a person wearing dark clothing walks out from between the bushes in front of A.D.'s building. The person walks toward the SUV backed into a parking space in front of the building. Seconds later, the SUV's lights turn on, and, a few seconds after that, the SUV's lights turn off and it drives out of the parking lot without its lights on.

_____

[2] An SUV that also appears to be a Dodge Journey that is gray or another dark color is parked directly in front of the camera at the beginning of the video and does not move at any point between 9:00 and 11:00 p.m.

25.

### e. February 15 investigation

{¶ 78} Gruenberg was one of the initial investigators who responded to A.D.'s apartment. He interviewed A.D.'s brother, who showed him a photograph posted to Facebook that depicts "an individual appearing to be Robert Sherman with what appears to be an AK47 sitting on his lap along with—looks like another pistol of some sort." He also helped execute a search warrant at Sherman's apartment that day that did not produce anything of evidentiary value.

{¶ 79} On cross-examination, Gruenberg said that he was not personally able to identify the person in the Facebook photograph as Sherman on February 15 and did not know when the photograph was taken or posted to Facebook. He did not show Evans, A.D.'s neighbor, the Facebook photo, did not know of anyone else showing her the photo, and did not know if anyone other than A.D.'s brother had identified the person in the picture as Sherman.

{¶ 80} When defense counsel asked Gruenberg if he could identify the man in the photo as Sherman, Gruenberg asked to see Sherman's right hand because the person in the picture has a tattoo on the back of his right hand. After looking at the backs of both of Sherman's hands, Gruenberg said that "based on the tattoo on his right hand in the picture and the tattoo on [Sherman's] right hand [he] can now identify this as Robert Sherman." Gruenberg could not, however, conclusively identify Sherman in any video footage that he reviewed. He could "only say it matches the description of Robert Sherman, the identifiers, height, weight."

26.

{¶ 81} Kral testified that, sometime before February 15, he saw the same photograph on Facebook, which he "believed to be Robert Sherman holding two firearms." The photo drew his attention because of "[t]he firearms on the lap[,]" which he identified as a pistol and a "Draco/AK style pistol or rifle . . . ." He found this noteworthy because Sherman was prohibited from having firearms.

{¶ 82} Kral thought the man in the picture was Sherman because of "[t]he build, other detectives that had encountered Mr. Sherman throughout the course of their duty, as well as physical identifiers." The primary "physical identifier" that Kral noticed was the tattoo on the man's right hand. He thought that the tattoo in the picture "matches or appears to be similar to the one that Mr. Sherman has on his hand." Observing the back of Sherman's hands in the courtroom assisted Kral in identifying Sherman because of the "location, and the tattoo itself appears to be almost similar to what is on the back hands of Mr. Sherman. . . . Appears to be similar." Kral could not definitively say that the tattoo on Sherman's hand matched the tattoo in the picture, but he thought that the tattoos were consistent. Kral also found the "position, the hair, the length, the size, not overweight, not super slim" to be similar to Sherman.

{¶ 83} Based on the Facebook photo, Kral opened an initial investigation into Sherman, which included determining vehicles he was driving and places he was sleeping. Kral identified A.D.'s apartment and his mother's apartment at Ottawa Landings as two places Sherman might have been staying during the first two weeks of February. The morning of February 15, before A.D.'s body was found, Kral went to both

27.

apartment complexes to see if he could find any rental cars that Sherman might have been driving, but he did not see anything noteworthy.

{¶ 84} On cross, Kral said that he was looking for cars that Sherman may have rented based on a hunch; he did not have any information that Sherman had actually rented a car.

{¶ 85} Kral could not remember when he first saw the Facebook photo. Although he could not see the face of the person in the picture, he determined that it was Sherman based on "the build, personal identifiers, and other investigators." He thought that the man in the picture "appears" to be around the same height as Sherman and, like Sherman, "was not obese . . . and he wasn't super thin." Kral had not had any personal contact with Sherman, so he had no personal familiarity with Sherman's height or weight, but he had previously "observed Mr. Sherman in music videos, . . . as well as Facebook posts . . ." when he was assigned to the TPD's gang task force. He also thought the man in the picture had hair similar to Sherman's but could not describe the hair beyond saying that it was "[b]lack hair." When defense counsel asked him to describe the man's hairstyle, Kral said that "[o]n here you cannot specify."

{¶ 86} Regarding the tattoo on the back of Sherman's hand, Kral said that he had never seen the tattoo in person before trial. However, he said that he had seen the tattoo in other photographs posted on social media and claimed that he had zoomed in on other photographs to look at the tattoo closely. He could not remember if he had zoomed in on the Facebook photo at issue in this case. Regardless, he did not know what the tattoo was

28.

or what it said. Kral admitted that he could "[n]ot 100 percent" identify the tattoo in the photo and said that he "can't be 100 percent certain . . ." that Sherman and the man in the photo have the same tattoo. He and the other detectives "believed it to be Robert Sherman" in the picture "[t]hrough other detectives as well as [Kral] on the identification with the similar hand tattoo and the post . . . ."

{¶ 87} Additionally, Kral could "not 100 percent . . ." say that the man in the Facebook photo and the man at the gun store were the same person and admitted that the most he could say is that the two people were similarly dressed. He also admitted, based on his experience with the TPD gang task force, that "a lot of African American males dressed with black Nike clothing, or dark clothing, and boots, Timberland boots . . ." in February 2022.

{¶ 88} On redirect, Kral clarified that after he first saw the Facebook photo, he "[l]ooked through past reports, social media as well as talk[ed] to other detectives" to familiarize himself with Sherman. He also reviewed photographs of Sherman and of Sherman's tattoos. He said that his identification of Sherman in the Facebook photo was based on "[a]ll the evidence from videos, photos, and other detectives." He agreed with the prosecutor's assessment that the placement, size, and lines of the tattoo he saw on Sherman's hand in court were "similar or significantly similar to . . ." the tattoo in the Facebook picture.

{¶ 89} Following his search for rental cars, Kral learned that A.D.'s body had been found at her apartment. He and several other detectives headed toward A.D.'s apartment,

29.

but as they were driving there, they heard on the radio that Sherman might be in a gray Dodge Journey that was not at the scene. Because the detectives knew that Sherman's mother lived at the Ottawa Landings complex, they detoured to Ottawa Landings to see if the Journey was there. They found the Journey backed into a parking spot at the back of the complex, in the lot closest to Sherman's mother's building. Kral could not remember where, exactly, the Journey was parked when police found it.

{¶ 90} After finding the Journey, Kral and his partners set up surveillance. Haney, the sergeant of the CGIC, joined them around 1:00 p.m. An hour or two after Kral got to Ottawa Landings and not long after Haney got there, a dark-colored Ford Edge pulled into the parking lot. Haney and Kral each testified that, although the driver initially went past the Journey, he came back, got out of his car, walked to the back of the Journey like he was looking at the license plate, got back in his car, and then left his car and went toward the door of Sherman's mother's building. The man came back "[m]oments later" (according to Haney) or a couple of minutes later (according to Kral), got back into the Edge, and drove away. Haney saw someone in the front passenger seat of the Edge, but he could not tell who they were or if they were male or female.

{¶ 91} "Hours later[,]" Haney said, the Edge returned to the apartment complex. This time, only the driver was in it. Haney thought it was the same driver from earlier. The driver got out of the car and briefly went to Sherman's mother's building before getting back in the car. "[W]ithin minutes[,]" another person came from the area of the apartment building's door and got in the Edge. This person was "smaller in stature" and

30.

"had a hood pulled up on [their] face." Although Haney could not determine whether the person was male or female, based on his knowledge of Sherman's appearance, Haney decided to have the Edge pulled over as it left the apartment complex.

{¶ 92} On cross, Haney said that Sherman never approached the Journey. He did not actually see Sherman come out of the apartment building and could not remember what Sherman was wearing.

{¶ 93} Kiser, a member of the TPD's SWAT unit, was involved in Sherman's arrest. His unit set up behind a firehouse across the street from Ottawa Landings. The detectives showed the SWAT team a picture of a dark blue Ford Edge that Sherman "was believed to have come and went from."

{¶ 94} When Kiser's unit received notice that a person matching Sherman's description was leaving Ottawa Landings in the Edge, they came out from behind the fire station and saw that "Sherman was in the passenger's seat wearing a COVID mask . . . ." Officers pulled the car over when it was out of the parking lot.

{¶ 95} When the car stopped, Kiser walked up to its passenger window with his rifle drawn because "we were advised that . . . the individual had utilized a Draco, which is a shorter AK47 rifle." The passenger identified himself as "Robert Sherman," and Kiser restrained him until the officers could take him into custody.

{¶ 96} On cross, Kiser said that the person in the car's passenger seat complied with Kiser's requests.

31.

{¶ 97} Kennedy, who showed Evans the photo array, testified again at trial. His testimony was, for the most part, the same as his testimony at the suppression hearing. He explained that he was a blind administrator, walked through his procedures for showing someone a photo array, and repeated that Evans identified Sherman as the man she had seen with A.D. and her comments that "number four [i.e., Sherman] is the one I saw in the apartment with the victim. . . .  I'm damn near positive. . . .  100 percent sure it's him."

{¶ 98} On cross, Kennedy acknowledged that the statement on the form he read to Evans asked her to identify the "suspect(s) who committed the crime[,]" but Evans only identified Sherman as someone she had seen in A.D.'s apartment, and, as counsel put it, her identification "had nothing to do with her saying that this individual committed a crime[.]"

{¶ 99} Evans testified that she "heard somebody running down the stairs, and [she] heard the door" around 10:00 or 10:30 p.m. on February 14. She thought the noise she heard "was the door being kicked several times, but it could have been something else, but then the car zoomed off." The car that "zoomed off" was the "gray truck." She saw the vehicle leaving because "it was loud, and [she] looked out [her] window."

{¶ 100} Later on February 15, an officer asked her to look at a photo array to see if she could identify the person she had seen coming to and going from A.D.'s apartment. She chose the person in photo number four as the man she had seen with A.D. In the

32.

days leading up to A.D.'s death, she had seen the man around A.D.'s apartment "[a] lot. Quite a few times."

{¶ 101} On cross-examination, Evans said that she told the police that the man she saw around A.D.'s apartment had acne, and the only person in the photo array with acne was the person in photograph four. She was able to see that he had acne because she "parked right next to him[,]" but she never spoke to him.

{¶ 102} Evans did not remember seeing the man with acne at the apartment building the night of February 14 and confirmed that she "didn't see anyone" that night, she "just heard it." She "wasn't sure" if the loud noises she heard around 10:00 or 10:30 p.m. that night were "banging on the door or they were gunshots." Evans admitted that she told the police that she heard someone run down the stairs and what she thought was three kicks at the front security door, without mentioning anything about gunshots. After hearing the noise, she looked out her bedroom window and saw the gray SUV "zooming off." It was "going too fast" for her to see who was driving it. She said that the SUV being loud or zooming off meant that its tires screeched as it pulled away. She also said that she would be surprised to hear that she never told the police that she heard a loud noise as the gray vehicle drove off.

### f. Additional evidence

{¶ 103} On February 16, Gruenberg went back to the Ottawa Landings complex to ask about surveillance video, which the complex did not have. While he was there, he learned that a maintenance worker had found a 7.62 x 39 mm shell casing. Based on his

33.

conversation with the maintenance worker, Gruenberg and his partner searched the area where the gray Dodge Journey had been parked the day before. As a result of that search, they found another shell casing "near the exact spot where the Journey was parked . . . ."

{¶ 104} On cross, Gruenberg admitted that he had "no idea" if Sherman was the reason that shell casings were found in the Ottawa Landings parking lot.

{¶ 105} Eycke executed search warrants for the Journey and the Edge. She found a total of "five silver colored Tulammo brand 7.62 by 39 cartridge casings" and "six brass colored Sig brand .9-millimeter Luger cartridges . . . ."

{¶ 106} Eycke found one 7.62 x 39 mm casing on the floor of the passenger side under the rear seat "at the door frame[,]" three casings in the cargo area "where the carpeted portion meets the hatch . . . [,]" and one casing on the "right side of the vehicle where the cargo area meets the seat." She found one 9 mm casing in the cargo area with the three 7.62 x 39 mm casings and five casings in and under the padding of one of the two children's car seats in the backseat of the Journey.

{¶ 107} Eycke did not find any fingerprints on the casings but swabbed them for potential DNA evidence. She also swabbed several areas of the Journey's interior for potential DNA evidence.

{¶ 108} Regarding the Edge, Eycke noted that the left side mirror was maroon, not dark blue like the rest of the car. She also noted that the Edge had three stickers on its back hatch: (1) a Coast Guard sticker in the lower left corner of the rear window, (2) a

34.

"goat . . . soup and whiskey" sticker on the left side of the tailgate above the Edge emblem, and (3) a Coast Guard sticker on the right side of the tailgate.

{¶ 109} Cogan, the TPD laboratory administrator, testified that he examined the shell casings collected as evidence to see if they might have been used in the same firearms.

{¶ 110} In this case, Cogan examined (1) the five 7.62 x 39 mm shell casings found at A.D.'s apartment; (2) the 7.62 x 39 mm shell casing found by a maintenance worker at Ottawa Landings; (3) the 7.62 x 39 mm shell casing found by police at Ottawa Landings; (4) the five 7.62 x 39 mm shell casings found in the Dodge Journey; and (5) the six 9 mm shell casings found in the Journey. Cogan explained that 7.62 x 39 mm ammunition is high-velocity rounds usually fired from an AK-47 or SKS rifle.

{¶ 111} In his report, Cogan made four comparisons of different combinations of the shell casings. First, after examining the 9 mm casings from the Journey, he concluded "[b]ased on the agreement of individual characteristics and all discernable class characteristics . . ." that the casings were all fired from the same firearm. Cogan did not define what "individual" or "class" characteristics are beyond saying that they are "different characteristics that may be on a shell casing or projectile that we can use to compare them to each other."

{¶ 112} Next, Cogan compared one of the 7.62 x 39 mm casings from A.D.'s apartment to another one of the casings from the apartment and to one of 7.62 x 39 mm casings from the Journey. He determined that these casings "were chambered in the

35.

same gun at some point in the past, and may or may not have been fired in this gun." He reached this conclusion because "there were not enough microscopic characteristics, individual characteristics to determine whether or not they were fired in the same firearm." However, he was still able to compare the "chambering marks" that are "picked up by a shell casing during the chambering of [a] live round."

{¶ 113} Third, Cogan compared a different 7.62 x 39 mm casing from A.D.'s apartment to a different 7.62 x 39 mm casing from the Journey and found that the casings "were chambered in the same gun at some point in the past, and may or may not have been fired in this gun."

{¶ 114} He broke the 7.62 x 39 mm casings with similar chambering marks into two groups because the three casings in the first group "were definitely chambered in the same firearm" and the two casings in the second group were also chambered in the same firearm, but he was "not saying that it was necessarily one gun. It could have been theoretically two guns." In other words, he could not definitively say that all five casings were chambered in just one gun.

{¶ 115} Finally, Cogan compared all of the remaining 7.62 x 39 mm shell casings (two from A.D.'s apartment, two from Ottawa Landings, and three from the Journey) to each other and found "[b]ased on the agreement of class characteristics without agreement or disagreement of individual characteristics due to a lack of individual characteristics, it could not be determined whether or not they were fired or chambered in the same firearm."

36.

{¶ 116} Essentially, Cogan's testimony boiled down to (1) all of the 9 mm casings found in the Journey were fired from the same gun; (2) three of the 12 total 7.62 x 39 mm casings—two from A.D.'s apartment and one from the Journey—were chambered in the same gun, and may or may not have been fired from that gun; (3) of the nine remaining 7.62 x 39 mm casings, two of them—one from A.D.'s apartment and one from the Journey—were chambered in the same gun, and may or may not have been fired from that gun; (4) those groups of casings may or may not have been chambered in the *same* gun; and (5) he could not determine whether the last seven 7.62 x 39 mm casings—two from A.D.'s apartment, two from Ottawa Landings, and three from the Journey—were chambered in or fired from the same gun.

{¶ 117} Altizer, a forensic scientist, analyzed three swabs from the shell casings, a swab from the Journey's steering wheel, and a swab from the Journey's gear shift. In her report, Altizer concluded that the DNA profile from each of the casing swabs was "not of sufficient quality for comparison due to insufficient data[,]" which meant that "there just wasn't enough DNA present on each of those samples to give an interpretable profile." She also concluded that there was a mixture of DNA on the steering wheel and gear shift swabs with one major contributor, which meant that the swab contained DNA from more than one individual and "one of the contributors provided a lot more DNA than the other contributor or contributors . . . ." She found that the major DNA profile on the steering wheel and gearshift was "consistent with Robert Sherman" and "the estimated frequency of occurrence of the major DNA profile is rarer than one in one trillion unrelated

37.

individuals." The rest of the DNA in the mixture was "too low level to do any sort of inclusion or exclusion on."

### g. Bunting's testimony

{¶ 118} Finally, Bunting testified about the significance of the evidence in the case and how he reached the conclusion that Sherman was responsible for A.D.'s murder.

{¶ 119} Bunting knew A.D. before February 15, 2022, and knew that she and Sherman were in a romantic relationship. He also knew that Sherman had just been released from prison on February 4, 2022.

{¶ 120} As Bunting was on his way to A.D.'s apartment the morning of February 15, he contacted Haney because he knew that Haney also had an active investigation into Sherman. Haney's unit did not make it to A.D.'s apartment, however, because they went to the Ottawa Landings apartment complex where Sherman was living.

{¶ 121} Once he got to A.D.'s apartment, Bunting spoke to Darrington, who he described as "very distraught." He also learned from Morgan that Hayes was a potential witness, and he had officers take Hayes to the police department for an interview.

{¶ 122} When Bunting went into the apartment, he saw A.D.'s body on the bed in a bedroom. He also saw "several shell casings, larger—what looked to be rifle rounds shell casings on the ground." He noticed one casing in particular that appeared to be "7.62 by 39 ammo."

38.

{¶ 123} After learning that A.D. had a gray Dodge Journey registered in her name, Bunting had the vehicle's description broadcast to the police department. He had the CGIC unit set up surveillance at Ottawa Landings when they found the Journey there.

{¶ 124} Bunting asked Mooney to put together the photo array and found detectives to be blind administrators. Later, he learned that Kennedy had shown the array to Evans, and she "positively identified Mr. Sherman as the individual she had seen going in and out of the apartment in the days prior to [A.D.'s] murder." At that point, he and other detectives contacted the prosecutor's office and decided that they were going to arrest Sherman for A.D.'s murder.

{¶ 125} Before Sherman was arrested, Bunting and Kennedy talked to his mother, who thought that Sherman was at her apartment. While they were on the phone with her, officers surveilling the apartment complex saw a person they thought was Sherman come out of the building and get into a blue Ford Edge. Officers ultimately stopped the Edge and found Sherman in it with Henderson.

{¶ 126} The Ford Edge came up later in Bunting's investigation when it was seen on the gun store's surveillance video. Bunting said that it was the same vehicle that Sherman was arrested in and that was towed to the TPD impound lot. In comparison photos of the two vehicles, Bunting pointed out that the driver's side mirror of the car at the gun store and the car in the impound lot is a "[d]arker maroon" color, not dark blue like the rest of the car, but it is not clear from the photographs that the state offered into evidence that the side mirror of either car is a different color from the rest of the body.

39.

Bunting also noted that the two vehicles had the same type of wheels. Finally, he noted that the Edge driving out of the gun store parking lot had stickers that "can be seen visible at the same locations on the back" as the three stickers that Eycke described on the back of the Edge that she processed. The photograph, like the video, shows several light-colored areas on the back of the Edge, but it is impossible to tell if they are stickers.

{¶ 127} The police did not find anything of evidentiary value when they searched Sherman's mother's apartment, and they never recovered either firearm that A.D. purchased on February 7.

{¶ 128} When Bunting saw the background and floor in the Facebook photo—which are a nondescript off-white and tan, respectively—it "struck [him] that it appeared to be the same kitchen . . ." from A.D.'s apartment.

{¶ 129} Bunting had not had "face-to-face contact" with Sherman before investigating A.D.'s murder but had seen photographs of him. He thought that the man in the Facebook picture had a tattoo on his right hand that was "strikingly similar to a tattoo Mr. Sherman has on his right hand of money. . . ." Bunting clarified that Sherman has a tattoo of the word "money" on his right hand. When Bunting "looked at another photograph of his tattoo side by side with . . ." the Facebook photo, the picture of Sherman's tattoo "very closely matches the layout of the tattoo on th[e] individual . . ." in the Facebook picture. Basically, Bunting said, "[b]ased on the location of the hands, the angles, the letters are written is strikingly similar to what I have seen on Robert Sherman's hand."

40.

{¶ 130} Bunting thought the shell casings that Eycke found in the Journey were important for several reasons. First, officers found the same type of shell casings around A.D.'s body. Second, officers found live rounds of the same ammunition in A.D.'s kitchen cupboard. And third, they were the same type of rounds—"Tulammo also known as a Red Army Standard"—that A.D. bought at the gun store when she bought the Mini Draco on February 7.

{¶ 131} Although the Mini Draco is classified as a handgun, Bunting said that it is "about four to five times of the size of a normal handgun" and most closely resembles an AK-47.

{¶ 132} Bunting found Cogan's conclusion that some of the casings from A.D.'s apartment and some of the casings from the Journey had been chambered in the same weapon "very significant" in determining that Sherman was a suspect "[b]ased on the fact that A.D. had purchased a 7.62 by 39 handgun as well as the fact that we found those spent rounds next to her body as well as those spent rounds in the Dodge Journey . . . ."

{¶ 133} Bunting noted that the surveillance video from A.D.'s apartment complex on February 13 showed (1) A.D. opening and closing the back door of the Journey several times, (2) a person he believed to be Sherman also "messing with or looking at the back door trying to get it to close[,]" (3) both of them going back into the apartment building, (4) the person he believed to be Sherman coming out of the building shortly later, and (5) A.D. coming out of the building soon after that. This video ended at 3:59 p.m., which was immediately before A.D. called 911. The video evidence, combined

41.

with the 911 call, led Bunting to believe that Sherman committed domestic violence and robbery on February 13.

{¶ 134} Regarding the February 14 surveillance video from A.D.'s apartment, Bunting described a gray Dodge Journey pulling into the parking lot around 9:00 p.m. and backing into a parking spot. This was significant to him because Evans said that Sherman would always back the Journey into a parking spot. Soon after, someone walked from the direction of the Journey into what Bunting thought was A.D.'s building.

{¶ 135} About an hour and 15 minutes later, around 10:20 p.m., the surveillance video shows someone leaving the same building. Bunting took a still photo of that portion of the video and zoomed in on the person. When he did so, he "noticed that it appeared that [the person] was carrying something in his hand here, and upon closer examination to [Bunting] it appears to be possibly a mini Draco firearm." The person walked to the area where the Journey was parked. The Journey's headlights and taillights briefly illuminate, then turn off. Bunting did not notice any issues with the Journey's lights when it drove into the parking lot, so he thought that this indicated that the person was "fleeing the location without headlights on or taillights on as a means to get away unnoticed."

{¶ 136} Bunting compared photographs taken from the surveillance video at the gun store on February 7 and the car dealership on February 14. He said that the man in those videos, whom he believed to be Sherman, was "wearing substantially the same clothing, if not the same clothing." Both were wearing "a dark colored possibly hooded

42.

sweatshirt, dark colored pants, as well as the tan or brown boots . . ." and a "similar type of surgical COVID mask." The man in the photo taken from the interior of the car dealership is also carrying a backpack that Bunting said was "substantially similar" to a backpack that officers found in A.D.'s bedroom.

{¶ 137} Bunting found Altizer's conclusion that Sherman was the major contributor to the DNA on the Journey's steering wheel and gearshift significant because he believed that Sherman was driving the Journey and he "would expect to see the results of this type . . ." considering that he did not know of anyone else driving the Journey.

{¶ 138} Bunting interviewed Sherman after his arrest. In the interview, Sherman said that A.D. might have been murdered by someone she was in a relationship with while Sherman was in prison who was jealous of Sherman now that he was out. However, no one in A.D.'s life indicated that she was in a relationship with anyone other than Sherman, and Bunting did not come across any evidence pointing to anyone else being responsible for A.D.'s murder.

{¶ 139} The state offered the video of Sherman's interview into evidence. In the video, Sherman is not wearing a black hoodie, black sweatpants, or tan boots. He is wearing a FILA hoodie that is dark blue or black and red, red sweatpants, and black sneakers with white soles. He also appears to have a surgical mask hanging under his chin.

{¶ 140} Sherman said that he was home at Ottawa Landings on February 15. He already knew that someone had shot A.D. because his mother had called to tell him, and

43.

he assumed she learned the news from Darrington. He did not know why he had been pulled over or arrested and did not ask officers why they arrested him because his mom told him that the police wanted to talk to him about the shooting.

{¶ 141} He admitted that he had seen A.D. after his release from prison but quit seeing her when his parole officer told him to stay away. He claimed that he had not had contact with her since a few days after he got out.

{¶ 142} Sherman did not know why A.D.'s car was found at his apartment complex, did not know how it got there, and did not drive it there. He had driven the Journey when A.D. first got it but had not driven it recently.

{¶ 143} Sherman denied that he was the person on video going to and leaving A.D.'s apartment complex the night of February 14.

{¶ 144} When Bunting asked Sherman what he thought had happened to A.D., he said that someone might have seen him with A.D. before his parole officer told him that he could not be around her, gotten jealous, and killed A.D. because of it.

{¶ 145} Throughout the interview, Sherman consistently denied hurting or killing A.D. and repeatedly said that he "didn't do anything to [his] kids' mom."

{¶ 146} On cross, Bunting said that he "cannot give you a 100 percent guarantee . . ." that the person in the surveillance video from A.D.'s apartment complex was Sherman. He pointed out in the close-up photo from the surveillance video of A.D.'s apartment what he thought looked like the Mini Draco but again said he "can't give you

44.

100 percent." Bunting did not test anything in A.D.'s apartment other than her body for Sherman's DNA.

### 4. Crim.R. 29 motion

{¶ 147} After the state rested, Sherman moved for acquittal under Crim.R. 29, arguing only that "the State has not met its burden, and . . . [he] is entitled to a directed verdict at this point." The state responded that it had "put forth sufficient evidence on each and every one of the essential elements of all of the counts [Sherman] is facing . . . ." The court denied Sherman's motion because "the State has met its sufficient burden requirement for the case to proceed to a Defense case at this time."

### 5. Sherman's case

{¶ 148} For his case-in-chief, Sherman first called Henderson, his brother, who asserted his Fifth Amendment privilege against self-incrimination and refused to answer any questions.

{¶ 149} After Henderson took the stand, Sherman called Bunting to confirm that Hayes did not identify Sherman in the photo array.

{¶ 150} On cross, Bunting said that he was not present when Hayes viewed the array, so he had no idea why Hayes chose the photo he did and did not know whether Hayes was scared at the time he viewed the array.

{¶ 151} On redirect, he said that the "only thing" he knew about Hayes's identification was the notation "written on the photo array form [that Hayes] stated he was 75 percent sure" of his identification.

45.

{¶ 152} Finally, Hayes, A.D.'s next-door neighbor who also viewed the photo array, testified for Sherman. He had given detectives a description of a person he saw, which led to detectives showing him a photo array.

{¶ 153} According to Hayes, the officer who showed him the array told him that it contained "old mugshots[,]" so he did not base his selection "off of similarities . . . ." Instead, he "went off [his] best guess of what is similar to most appearance of most people." Hayes told the officer that he was about 75 percent sure that the person he chose was the same one he saw at the apartment. He initially said that he did not give the police a description of the man he saw because they did not ask him for one, but in response to counsel's questions, he admitted that he told police that the man he saw in A.D.'s apartment had dreadlocks that were black at the top and brown or blonde at the bottom and had a deep voice. He also told the police that he had seen the man he chose from the photo array carrying an AK-47 and wearing a sweatsuit with a gray jacket and either gray or black pants.

{¶ 154} When defense counsel asked Hayes if Sherman "was the individual that [Hayes] saw in [A.D.'s] apartment at any time" during the month of February 2022, Hayes said, "Yes, that's who I saw. It was his same skin tone, complexion, and the hair." But he admitted that he chose someone else from the photo array who had "the same complexion and also had dreads with brown at the bottom." Hayes said that Sherman did not have blonde tips on his dreadlocks at the time of trial, "but when [Hayes] saw him he did."

46.

{¶ 155} On cross, Hayes confirmed that Sherman was the person he saw going to and coming from A.D.'s apartment in the days leading up to her murder.

{¶ 156} In response to a question from the court, Hayes said that he did not remember the specific day he saw the man with the AK-47, but based on his work schedule, knew that it was on a weekend and at night. He also said that it was "about a couple days before" A.D. was murdered, and that A.D. was not home that weekend "because of the incident that was going on." Hayes's attention was drawn to the man because he heard "running up and down the stairs, . . ." "rummaging around in [A.D.'s] living room, . . ." which was on the other side of Hayes's living room wall, and then the man would "run downstairs, run back upstairs, run back some more, run back downstairs, run upstairs, . . . rummaging some more, and then he would leave for about 30 minutes to an hour and come back . . . and do it all over again." The man repeated that process about three times that night. Because of the commotion, Hayes looked out his bedroom window, which overlooks the parking lot and part of the sidewalk, and could "clearly see that it was on the hip."

{¶ 157} Following Hayes's testimony, Sherman rested. He renewed his Crim.R. 29 motion, which the trial court denied.

### 6. Outcome

{¶ 158} The court found Sherman guilty of all charges and firearm specifications.

{¶ 159} At sentencing, the court merged the aggravated murder and murder convictions. The state elected to proceed with sentencing on the aggravated murder

47.

count.  The court sentenced Sherman to a definite prison term of 18 months for the domestic violence conviction; an indefinite prison term with a stated minimum term of 8 years and an indefinite maximum term of 12 years for the robbery conviction; a term of life in prison without the possibility of parole for the aggravated murder conviction, plus a mandatory, consecutive term of 3 years in prison for the firearm specification; a definite prison term of 36 months for the weapons under disability conviction; and 180 days in jail for each endangering children conviction.  The court ordered Sherman to serve the felony sentences consecutively and the misdemeanor sentences concurrently with each other and with the felony sentences.

{¶ 160} Sherman now appeals, raising three assignments of error:

I. The trial court erred in denying Appellant's Crim.R. 29 motion.

II. The trial court's verdict was against the manifest weight of the evidence presented at trial.

III. The trial court erred to the prejudice of Appellant by denying his motion to suppress an unduly suggestive photo identification.

## II. Law and Analysis

### A. The photo array was not unduly suggestive.

{¶ 161} For ease of discussion, we address Sherman's assignments of error out of order.  In his third assignment of error, Sherman argues that the trial court erred by denying his motion to suppress because the photo array police showed to Evans was unduly suggestive.  He contends that "the skin tones, as well as the ages and facial hair,

of the individuals in the array photos are not similar[,]" and because his photograph is the only one in which the person has apparent acne and Evans "told someone . . . that she had seen [Sherman] before and that his acne had stood out to her." The state responds that the composition of the photo array and Evans's immediate identification of Sherman show that the array was not unduly suggestive.

{¶ 162} Our review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. The trial court acts as the trier of fact at a suppression hearing by weighing the evidence and determining the credibility of the witnesses. *Id.* We must accept the trial court's factual findings if they are supported by competent credible evidence, and "'independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.'" *State v. Wesson*, 2013-Ohio-4575, ¶ 40, quoting *id.*

{¶ 163} "Photo array evidence is suppressed only if the identification, or method of identification, is unduly suggestive and unreliable." *State v. Gaines*, 2010-Ohio-91, ¶ 15 (6th Dist.), citing *State v. Waddy*, 63 Ohio St.3d 424, 438 (1992); and *Neil v. Biggers*, 409 U.S. 188 (1972). Generally speaking, a photo array is not unduly suggestive if the other photos depict people who appear with relatively similar age, features, skin tone, facial hair, apparel, and photo background. *See State v. Williams*, 2022-Ohio-2439, ¶ 33-35 (6th Dist.) (citing cases). The defendant has the burden of establishing that the identification procedure was unduly suggestive. *Id.* at ¶ 32. If the defendant meets that burden, the court must consider if, under the totality of the circumstances, the

49.

identification is reliable, despite its suggestive nature. *State v. Heflin*, 2011-Ohio-4134, ¶ 17 (6th Dist.).

{¶ 164} Here, we find that the photo array was not unduly suggestive. The array shows six men who generally have the same skin tone, have some facial hair, and appear to be around the same age. One man has a slightly darker complexion than the other men, another has facial hair that is less noticeable than the others', and, as the trial court noted, Sherman has "spots" on his face, but none of these features make Sherman's photo more prominent or noticeable than the others. The trial court's assessment that "it is not entirely clear from the photo that these spots are acne sores, scars, variations in skin pigmentation, or even digital photo noise anomalies" is supported by the record. At least two other men also have "spots" of indeterminate origin—albeit fewer of them—on their faces, which lends support to the trial court's conclusion that the marks on Sherman's face do not make the array unduly suggestive.

{¶ 165} Even if the array were unduly suggestive, Sherman has not shown that Evans's identification of him was unreliable, and an identification must be both unduly suggestive *and* unreliable to be suppressed. *Heflin* at ¶ 17. Reliability is determined under the totality of the circumstances, considering (1) the witness's opportunity to view the defendant, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description, if any, of the defendant, (4) the witness's certainty, and (5) the amount of time that elapsed between the offense and the identification. *Id.* Evans testified that she had seen Sherman around A.D.'s apartment "[a] lot" and "[q]uite a few times" in the days

50.

leading up to A.D.'s death, and she identified him the day A.D.'s body was discovered. Evans had also "parked right next to . . ." Sherman, which allowed her to see his face well enough to notice that he had the acne that "stood out" to her. She was "damn near positive . . ." of her identification and identified him almost immediately. On the whole, the totality of the circumstances shows that Evans's identification was reliable, so even if the photo array were improperly suggestive, the trial court did not err by failing to suppress it. Therefore, Sherman's third assignment of error is not well-taken.

### B. The trial court did not err by denying Sherman's Crim.R. 29 motion.

{¶ 166} In his first assignment of error, Sherman argues that the trial court erred by denying his Crim.R. 29 motion for acquittal. He contends that his convictions are not supported by sufficient evidence because, essentially, "the only real issue is identification," and the state failed to prove that he was the person who committed the crimes.

{¶ 167} In response, the state argues that it "presented a very thorough case" that established that Sherman was the perpetrator of each of the crimes. It presented evidence of Sherman's prior domestic violence conviction and had A.D.'s identification of Sherman as her assailant on the 911 call from February 13, regardless of her later recanting her accusations. It also contends that the sum total of the circumstantial evidence it presented about the perpetrator of the remaining crimes shows that Sherman is the person who committed those offenses.

51.

{¶ 168} A motion for acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 2005-Ohio-1507, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 2006-Ohio-2417, ¶ 37.

{¶ 169} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). We do not weigh the evidence or assess the credibility of the witnesses. *State v. Were,* 2008-Ohio-2762, ¶ 132. "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).

### 1. February 13 crimes

{¶ 170} First, we find that the state presented sufficient evidence to show that Sherman is the person who committed the domestic violence and robbery offenses on February 13, 2022.

{¶ 171} The state presented evidence that A.D. reported to the 911 dispatcher on February 13 that Sherman, the father of her children, hit her, threw her to the ground, and took her apartment key. She was upset and possibly crying when she made the 911 call.

52.

Erhart and her partner were dispatched to an address that turned out to be A.D.'s apartment. When they got to the apartment about 20 minutes after A.D. called 911, they attempted to discuss A.D.'s report to the 911 dispatcher, but she "did not really want to talk to . . ." them. A.D. told them that she was fine, she and Sherman had a heated argument, she was lightly pushed, and she simply could not find her key. According to Erhart, although A.D. was still "visibly upset about something[,]" she was not crying, she was not bruised, and the apartment was not in disarray.

{¶ 172} The testimony of one witness, if believed, is enough to support a conviction. *State v. Thompson*, 2017-Ohio-8375, ¶ 5 (10th Dist.). Therefore, A.D.'s report on the 911 call, if believed, is sufficient to show that Sherman is the person who hit her, threw her to the ground, and robbed her on February 13. The fact that A.D. changed her story by the time the police arrived at her apartment is a credibility issue—which we do not consider when reviewing the sufficiency of the evidence—that goes to the weight of the evidence. *See State v. Watson*, 2024-Ohio-1711, ¶ 58 (6th Dist.), citing *State v. Pratts*, 2016-Ohio-8053, ¶ 49 (8th Dist.) (a witness's recantation goes to the weight of the evidence, not its sufficiency).

{¶ 173} Because A.D.'s initial version of events, if believed, showed that Sherman is the person who assaulted and robbed her on February 13, the trial court did not err by denying Sherman's Crim.R. 29 motion regarding the February 13 charges.

53.

## 2. February 14 crimes

{¶ 174} Regarding the remaining crimes, we also find that the state presented sufficient evidence to show that Sherman is the person who committed the aggravated murder, firearm specification, weapons under disability, and child endangering offenses on February 14, 2022. The state's evidence, if believed, allows the trier of fact to make a set of reasonable inferences that connect Sherman to the crimes and identify him as the perpetrator.

{¶ 175} In the circumstantial evidence related to A.D.'s murder, there are several threads of evidence that, when teased out and woven together, combine to establish Sherman's identity.

### a. Commonalities

{¶ 176} The man police suspected of the crimes showed some common traits in the video evidence. In all of the videos, the person appeared to be about the same height and build, and several witnesses said that the person in the videos was about the same height and build as Sherman. In most of the videos, the man was wearing a black hoodie with the hood up, black sweatpants, tan boots, and a surgical mask, and a white Nike logo or patch of white is visible on the left breast of the hoodie, the left hip of the sweatpants, or both in some of the videos. And in each video except the one of the man leaving A.D.'s apartment after the murder, it is clear that the man displayed the same idiosyncratic behavior of wearing a surgical mask at all times, whether he was indoors, outdoors, in a public space, or coming from a private building or vehicle.

54.

### b. Man at the gun store

{¶ 177} Sherman was arrested while riding in a blue Ford Edge with a maroon side mirror and three stickers on its rear hatch that his brother, Henderson, was driving. A.D. and the man with her at the gun store rode in a blue Ford Edge with a maroon side mirror and three light-colored patches on its rear hatch. The man knew A.D. well enough to put his arms around her waist and intimately embrace her while they were in the store, and Sherman is the only person A.D. reportedly had a romantic relationship with. This evidence was sufficient to allow the trial court to reasonably infer that Sherman was the man at the gun store.

### c. Man at the car dealership

{¶ 178} We have already established that it was reasonable for the trier of fact to infer that Sherman is the man who drove A.D.'s Journey away from her apartment at 4:00 p.m. on February 13 as A.D. was calling 911 to report that Sherman had assaulted and robbed her. From that, it is also reasonable to infer that the identically-dressed man who was with A.D. trying to fix the Journey's back door just minutes earlier was Sherman, so Sherman knew about the broken door. Ismail testified that it was A.D.'s Journey that a man brought back to his dealership with a broken back-passenger door on February 14. This evidence was sufficient to allow the trial court to reasonably infer that Sherman was the man at the dealership with A.D.'s Journey.

55.

### d. Man in the Facebook photo

{¶ 179} The man in the Facebook photo is holding guns that look similar to the ones A.D. purchased on February 7. The tattooed back of his right hand is mostly visible in the picture. Bunting, Gruenberg, and Kral each testified that the tattoo in the picture is similar to the tattoo on the back of Sherman's right hand. Kral said the tattoos "appear[] to be almost similar . . . [,]" but he could not be certain that they were the same, and his testimony ultimately showed that he lacked familiarity with Sherman's tattoo. After looking at Sherman's tattoo in the courtroom, Gruenberg identified the man in the photo as Sherman. Bunting told the court what Sherman has tattooed on his hand and said that Sherman's tattoo "very closely matches" and "is strikingly similar to" the tattoo in the picture based on the "layout[,]" "location of the hands, the angles, [and] the [way] letters are written . . . ." Bunting also thought that the nondescript off-white wall and tan floor in the background of the Facebook photo looked like the wall and floor in A.D.'s kitchen. This is more than sufficient evidence to allow the trial court to reasonably infer that the man in the Facebook picture is Sherman.

### e. Shell casings

{¶ 180} Along with her guns, A.D. bought Sig brand 9 mm Lugar ammunition for the Girsan. Although A.D. did not buy Tulammo brand 7.62 x 39 mm ammunition for the Mini Draco, police found several live Tulammo 7.62 x 39 mm rounds, along with several live Sig 9 mm Luger rounds and an empty carrying case for a Girsan handgun, in her apartment. They also found Sig 9 mm and Tulammo 7.62 x 39 mm shell casings in

56.

A.D.'s Journey, Tulammo 7.62 x 39 mm shell casings in A.D.'s bedroom, and Tulammo 7.62 x 39 mm shell casings in the Ottawa Landings parking lot in the vicinity of A.D.'s Journey. All of the Sig 9 mm casings were fired from the same gun. Some of the Tulammo 7.62 x 39 mm casings from the Journey and some from A.D.'s bedroom were chambered in the same gun, which may have been the same gun for all the casings or may have been one gun for each of the two groupings of casings. This evidence was sufficient to allow the trial court to reasonably infer that the person who had A.D.'s Journey also had the gun or guns that chambered rounds that left casings in A.D.'s bedroom.

### f. Guns

{¶ 181} A.D. bought a Girsan 9 mm handgun and a Mini Draco AK-47-style handgun. The man in the Facebook photo—i.e., Sherman—had possession of two handguns that looked like the guns A.D. bought when she was with the man at the gun store—i.e., Sherman. A.D. was killed with a high-powered rifle like a Mini Draco, and Bunting thought that the person leaving A.D.'s apartment after her murder was carrying a Mini Draco. Although Hayes did not initially identify Sherman in the photo array, at trial, he recognized Sherman and testified that he had seen Sherman in the parking lot of A.D.'s building with an AK-47 a couple of days before the murder. This evidence was sufficient to allow the trial court to reasonably infer that Sherman had access to a high-powered rifle like the one used to kill A.D. around the time of her murder.

57.

## g. The Dodge Journey

{¶ 182} The reasonable inferences we have already laid out have Sherman driving A.D.'s Journey away from her apartment the afternoon of February 13 and to the car dealership the morning of February 14. There is also video of a man matching all of Sherman's particulars from the other videos driving the Journey away from A.D.'s apartment around 3:15 p.m. on February 14. That night, a dark-colored SUV that looks like A.D.'s Journey drove to her apartment complex, backed into a spot in front of her building, and parked there for over an hour. The person who got out of the SUV and went into A.D.'s building was wearing a surgical mask. Someone drove the Journey away from A.D.'s apartment complex after A.D. was dead. Evans heard someone running down the stairs, a loud noise that she thought was someone banging on the security door or gunshots, and a car "zooming off" around 10:00 or 10:30 p.m. When she looked out her window, she saw a gray or silver SUV, which was parked directly in front of her window, driving away, but it was going too fast for her to see who was driving it. Evans identified Sherman as the man she had seen around A.D.'s apartment "[a] lot" in February 2022, and said that he drove a gray or silver SUV and tended to back into parking spaces.

{¶ 183} The next day, police found A.D.'s Journey parked at Ottawa Landings, where Sherman was living. He could not explain why A.D.'s car was at his apartment complex or how it got there. Sherman was the major contributor to the mixture of DNA found on the Journey's steering wheel and gearshift, and Bunting did not hear of anyone

58.

but Sherman driving it. This evidence was sufficient to allow the trial court to reasonably infer that Sherman was driving the Journey and had it in his possession between the afternoon of February 14 and the afternoon of February 15.

### h. Additional evidence

{¶ 184} In addition to that evidence, Jackson testified that there were no signs of forced entry into A.D.'s apartment, A.D.'s purse was not rifled through or taken, and A.D.'s laptop was not taken, which was what he would expect if it had been "a break-in or a robbery type thing . . . [,]" as Sherman argues. There was also a "To Do List" at A.D.'s apartment that included a reference to "after I get out" and tasks like "Find hit equipment[,]" "Have sister get strap for you[,]" "Sniper Rifle[,]" and "Find out how to break down Gun so u can ride w/ it." Police also found a backpack on the floor of A.D.'s bedroom that was "substantially similar" to the one Sherman was carrying at the car dealership; from the photos and videos, they appear to be the same brand and color.

{¶ 185} Most of the witnesses could not say that the person in the videos was Sherman, could not identify Sherman with certainty, or could not provide specific information about Sherman's identifying features. The videos from the night of February 14 do not clearly show who went into A.D.'s building, the color or type of SUV, or what, if anything, the person was carrying when they came out of A.D.'s building. Sherman was not wearing a black hoodie, black sweatpants, and tan boots when he was arrested. However, Kiser said that Sherman was "wearing a COVID mask" when he was pulled

59.

over, and he appears to have a surgical mask hanging under his chin in the interview video.

{¶ 186} Cogan's findings regarding whether some casings from the Journey, some from A.D.'s bedroom, and both from Ottawa Landings were fired from or chambered in the same gun were inconclusive, so there is no evidence that the casings from Sherman's apartment parking lot were chambered in the same gun as any of the casings from A.D.'s bedroom or car.

{¶ 187} Police never found either of the guns A.D. purchased.

{¶ 188} Hayes identified someone other than Sherman—with 75 percent certainty—when he looked at the photo array.

{¶ 189} At trial, Evans admitted that she told the police that she thought the loud noise she heard the night of the murder was someone kicking the security door and never mentioned gunshots.

{¶ 190} Finally, Sherman told the detectives that he had not had contact with A.D. since his parole officer told him to stay away from her a few days after he got out of prison, he had not murdered A.D., and he would not hurt the mother of his children.

{¶ 191} When all of these threads of evidence are pulled together, we have the following set of reasonable inferences:

- Sherman was with A.D. at the gun store.

- Sherman is the person in the Facebook photo.

- Sherman was at A.D.'s apartment on February 13.

60.

- Sherman was at the car dealership on February 14.

- Sherman was at A.D.'s apartment the afternoon of February 14.

- Sherman was driving the Journey on February 13 and 14.

- Sherman had access to a high-powered rifle like the one used to kill A.D. around the time she was murdered.

- The person who had A.D.'s Journey also had the gun or guns that chambered rounds that left casings in A.D.'s bedroom.

Additionally, Sherman wore a surgical mask in each instance we have identified him, whether he was indoors, outdoors, in public spaces, or coming from a private building or vehicle, and we know from Evans's testimony and some of the videos that he tended to back his gray or silver SUV into parking spaces in front of A.D.'s building. The person who went into A.D.'s building around 9:00 p.m. the night of her murder also wore a surgical mask and backed a dark-colored SUV (that was possibly gray and possibly a Dodge Journey) into a parking spot in front of the building.

{¶ 192} Presented in these terms, it becomes apparent that the state adduced sufficient evidence to identify Sherman as the person who murdered A.D. with a firearm, had a weapon under disability, and endangered children on February 14, 2022. Although the state's evidence is highly circumstantial, "[l]ike any fact, the state can prove the identity of the accused by 'circumstantial or direct' evidence." *State v. Tate*, 2014-Ohio-3667, ¶ 15, quoting *State v. Jenks,* 61 Ohio St.3d 259, 272-273 (1991), *superseded by constitutional amendment on other grounds as stated in Smith*, 80 Ohio St.3d at 102, fn.

61.

4. Direct and circumstantial evidence have the same probative value, and a conviction can be based solely on circumstantial evidence. *State v. Aekins*, 2023-Ohio-322, ¶ 74 (10th Dist.); *State v. Thompson*, 2020-Ohio-3131, ¶ 20 (6th Dist.), citing *Jenks* at paragraph one of the syllabus; and *State v. Franklin*, 62 Ohio St.3d 118, 124 (1991). The state established enough circumstantial connections between Sherman and the man in the videos and Facebook picture to show that they are the same person, and between Sherman and the crimes committed at A.D.'s apartment on February 14 to show that he committed them. Thus, there was sufficient evidence for the aggravated murder, firearm specification, weapons under disability, and child endangering charges to survive Sherman's Crim.R. 29 motion.

{¶ 193} Sherman's first assignment of error is not well-taken.

**C. Sherman's convictions are supported by the weight of the evidence.**

{¶ 194} In his second assignment of error, Sherman argues that his convictions are not supported by the manifest weight of the evidence. He contends that the trial court "did not fully consider and properly weigh all the evidence . . . prior to determining his guilt . . ." because "identification issues permeated this case" and "[t]here was no eyewitness testimony or direct evidence offered by the State of Ohio and the evidence that was presented on each charge was circumstantial requiring the court to make and stack multiple inferences as to [his] involvement."

{¶ 195} The state responds that "at least two of [its] witnesses identified Sherman as the person who committed the crimes . . ." and his convictions are not against the

62.

weight of the evidence simply because the trial court chose to disbelieve Sherman's theory of the case.

{¶ 196} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the finder of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387. We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), quoting *id.* Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172*,* 175 (1st Dist.1983).

{¶ 197} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the trial court's credibility determinations, given that it is the trial court that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). The trial court, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or

63.

disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 2008-Ohio-1557, ¶ 62 (6th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 198} After carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against a conviction. Although Sherman complains that his convictions are based only on circumstantial evidence, the trial court was permitted to rely on circumstantial evidence to the same extent that it relied on any direct evidence because direct and circumstantial evidence have the same probative value, and a conviction can be based solely on circumstantial evidence. *Aekins*, 2023-Ohio-322, at ¶ 74 (10th Dist.). The fact that the state presented a case that was almost entirely circumstantial does not, in and of itself, make Sherman's convictions against the weight of the evidence.

{¶ 199} To be sure, the state's identity evidence was not perfect. A.D. recanted her allegations of domestic violence and robbery about 20 minutes after she called 911 to report them. None of the witnesses saw the shooting, the witnesses testified about a man who covered his hair with a hood and most of his face with a mask, several witnesses could not describe the physical features of the man they saw, and only one witness was completely sure of her identification of Sherman. But even with these shortcomings, the state was able to persuasively link Sherman to the crimes.

{¶ 200} Regarding A.D.'s identification of Sherman as the perpetrator of the February 13 crimes, in addition to the evidence that A.D. changed her story about the

64.

February 13 incident, the state presented evidence that Sherman assaulted A.D. in 2020, A.D. reported to the responding police officers that Sherman said he would kill her if she called the police or he went to jail, and Sherman had just been released from prison as a result of that domestic violence conviction. Taking that history into account, we find A.D.'s initial identification credible, despite her recantation.

{¶ 201} Regarding the February 14 crimes, as outlined above, reasonable inferences that the trial court could draw from the state's evidence connect the dots from the man in the videos and the Facebook photo to Sherman and A.D.'s murder. When the evidence is laid out, it is clear that any inferences the trial court made to reach its conclusion that Sherman committed the charged crimes were necessarily supported by the facts or by inferences derived from the facts. *See State v. Everhart*, 2020-Ohio-4948, ¶ 17 (12th Dist.) ("'Impermissible inference stacking' involves drawing an inference based entirely upon another inference, unsupported by any additional facts or another inference derived from facts."). In other words, the circumstantial nature of the state's case did not result in the trial court impermissibly stacking inferences.

{¶ 202} On balance, we cannot say that the trial court lost its way when it convicted Sherman. Therefore, Sherman's convictions are not against the manifest weight of the evidence, and his second assignment of error is not well-taken.

65.

### III. Conclusion

{¶ 203} Based on the foregoing, the June 16, 2023 judgment of the Lucas County Court of Common Pleas is affirmed. Sherman is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

_____
JUDGE

Gene A. Zmuda, J.

_____

Charles E. Sulek, P.J.
CONCUR.

JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.